42 A.3d 1017

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Harve Lamar JOHNSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 10, 2011.

Decided April 26, 2012.

360

Joanne Tyler–Floyd, Joanne Floyd, Esq., PC, for Harve Lamar Johnson.

Timothy Jon Barker, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice EAKIN.

This is a direct appeal *nunc pro tunc*[1] from a death sentence imposed after a jury convicted appellant of first degree mur-

---

1. Appellant's counsel, believing the automatic appeal of the death sentence was sufficient notice of appeal, did not file a timely notice of appeal. After counsel realized his lapse, the trial court granted appellant leave to file a notice of appeal *nunc pro tunc*.

der.[2] At the penalty phase, the jury found two aggravating circumstances and one mitigating circumstance; the jury found the aggravating circumstances outweighed the mitigating circumstance and sentenced appellant to death. For the following reasons, we affirm.

Victim was a two-year-old female child living with her mother and her mother's boyfriend, the appellant. On April 6, 2008, police were called to their residence, where they found appellant outside. Victim was on the kitchen floor, unresponsive, and had both old and new bruises all over her body. Police attempted to revive victim, and paramedics transported her to York Hospital. Victim was then transferred to Hershey Medical Center, where she died the next day.

Mother initially told police her daughter fell into the bathtub; she later told police she fell down a flight of stairs. At trial, mother testified otherwise.[3] Before April 6, 2008, victim had bruises on her fingers and legs and bald spots on her head. On that morning, victim upset appellant by coming into mother and appellant's bedroom. Appellant hit victim and told her to stand in the corner. At about 12:20 p.m., mother heard appellant yelling and victim crying, and saw appellant spanking the child at the top of the stairs. The spanking caused the child's diaper to explode, which angered appellant further; he began beating her again and threatened to beat mother. Mother, who was in a separate room during most of this incident, indicated appellant beat victim for 20 to 30 minutes, although she repeatedly asked him to stop. Eventually, mother could no longer hear victim scream or appellant yell. She then heard water running in the bathtub for approximately 10 minutes. Appellant returned, carrying victim's limp body. Appellant and mother attempted to resuscitate victim and, on mother's prodding, appellant called 911.

At trial, Police Sergeant Roy Kohler testified that when he responded to the 911 call, he noticed appellant near the residence, breathing rapidly and appearing distraught. Koh-

2. 18 Pa.C.S. § 2502(a).

3. Mother pled guilty to third degree murder for her involvement in victim's death, in exchange for her testimony against appellant.

ler asked appellant if he was okay; appellant replied, "No, I don't feel well." N.T. Trial, 11/9/09, at 111. Kohler asked appellant to come to his police cruiser to be medically examined, and appellant agreed. While they were walking to the cruiser, appellant said, "I know I'm in trouble because of all the bruises all over her body. I beat her yesterday pretty bad with a belt." *Id.*, at 113.

Emergency Medical Technician (EMT) Supervisor Donald Sanders testified he medically examined appellant in the back of the cruiser. During the examination, appellant asked how victim was doing. Sanders said they were doing everything possible for the child, and asked what happened to her. Appellant replied, "I've been beating her." *Id.*, at 148. Sanders inquired, "What do you mean?," and appellant stated, "I'm sorry, I did it." *Id.* Sanders asked again, "What do you mean you did it?" *Id.* Appellant elaborated, "I have been hitting the child for the last two or three days." *Id.* Sanders then asked, "Well, what did you use on the child?" Appellant responded, "A belt." *Id.*, at 149. Kohler subsequently drove appellant to the York City Police Department. During the drive, appellant said, "That girl and her mother bruise when I touch them at all. If I bite her mother or hit [victim] at all, they bruise right up." *Id.*, at 117.

At the police department, appellant admitted to detectives that, on multiple prior occasions, he beat victim as a form of discipline. He said victim came into his bedroom between 5:30 a.m. and 6:00 a.m. the day before her death, waking him up. He told victim to stay in a corner of the bedroom until he and mother awoke. He later woke up, left the residence, and returned to find mother upset. He assumed mother was upset because of victim, so between 12:30 p.m. and 1:00 p.m. he struck victim on her arms and buttocks approximately seven times with the cord from an Xbox controller. He noted these blows could have injured victim's chest and back because the cord wrapped around her body. Victim then moved her bowels, so he took her to a running bathtub of hot water. Appellant claimed he left the child in the bathtub to bring her clean clothes and, when he returned, he found her drowning and noticed a lump on her head. Appellant summoned moth-

er, argued with her about what happened, and sought to revive victim. He admitted he did not call 911 immediately because victim was breathing and he did not want police to see the injuries on her arms.

The Commonwealth also introduced evidence showing blood spatter on a bedroom wall matched victim's DNA. Blood found on the top of the Xbox controller, a child's boot, appellant's clothes, and hairs found in a bedroom also matched victim's DNA. Blood and blood spatter, consistent with impact spatter and matching victim's DNA, were found on victim's clothes.

While victim was being treated at York Hospital, a nurse trained in forensic examination documented and photographed victim's injuries. Eighteen of these photographs were admitted at trial, and the nurse explained the injuries she photographed.

The morning after victim died, a forensic pathologist conducted an autopsy on victim's body and determined she died of multiple traumatic injuries. The pathologist found approximately 220 external injuries on victim, 150 of which were "fresh," meaning they had occurred within 24 hours of victim's admission to the hospital. He noted victim's right ear had fresh trauma, and the center of her right ear had an abrasion consistent with someone scraping a fingernail in her ear. Victim's hair on the right side of her head was pulled out by its roots. Injuries on her left shoulder were caused by the cord of the Xbox controller, and her entire left arm was swollen. The pathologist determined bruises on the back of victim's forearm and contusions, bruises, and abrasions to her feet and lower legs were caused by blunt force trauma. The pathologist discovered numerous fresh internal injuries to victim's head, including swelling and bleeding in her brain, as well as retinal hemorrhages and damage to her spinal cord. He noted victim suffered trauma to her heart, right lung, liver, pancreas, and right adrenal gland, which were caused by multiple high-velocity impacts to the chest and belly. There were also hemorrhages to her neck caused by compression or strangulation. He opined victim was repeatedly struck at a speed of approximately 20 miles per hour. He concluded, at

the rate of an injury every 20 seconds, it would take 45 to 60 minutes to inflict all of victim's fresh injuries.

A jury convicted appellant of first degree murder. At the penalty phase, the jury found—two aggravating circumstances: the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8), and victim was a child under the age of 12. *Id.*, § 9711(d)(16). The jury found one mitigating circumstance: appellant had no significant history of prior criminal convictions. *Id.*, § 9711(e)(1).[4] The jury determined the aggravating circumstances outweighed the mitigating circumstance and sentenced appellant to death. *Id.*, § 9711(c)(1)(iv).

■ When a death sentence is imposed, "this Court has an obligation to review the record to ensure the evidence sufficiently supports the first degree murder conviction and the finding of aggravating circumstances, and that the sentence was not the product of passion, prejudice, or other arbitrary factors." *Commonwealth v. Dick,* 602 Pa. 180, 978 A.2d 956, 958 (2009) (citing 42 Pa.C.S. § 9711(h)(3)(i)-(ii)). In addition, appellant raises the following issues, which we rephrase and reorder for ease of discussion: (1) whether the trial court erroneously admitted prior bad act evidence regarding old injuries suffered by victim; (2) whether the trial court should have suppressed appellant's statements to Sergeant Kohler and EMT Supervisor Sanders; (3) whether the trial court should have suppressed appellant's statement made en route to the police department; (4) whether appellant's statements to detectives should have been suppressed; (5) whether search warrants for appellant's residence were valid; (6) whether appellant should have been excused from the courtroom during trial; (7) whether photographs of victim's injuries were properly admitted; (8) whether photographs of victim's injuries were properly used during mother's testimony; (9) whether the trial court erroneously admitted hearsay testimony; (10) whether the trial court should have instructed the jury on voluntary manslaughter; (11) whether the pathologist should

4. Appellant also introduced evidence supporting the "catch-all mitigator" of any other evidence of mitigation concerning his character and record and the circumstances of his offense. *See* 42 Pa.C.S. § 9711(e)(8).

have testified at the penalty phase; (12) whether the trial court erred in limiting the direct examination of appellant's mother; (13) whether jurors should have been allowed to utilize their guilt phase notes in the penalty phase; and (14) whether the trial court improperly curtailed appellant's penalty phase closing argument.

## I. SUFFICIENCY OF EVIDENCE FOR FIRST DEGREE MURDER CONVICTION

■ We begin by reviewing the sufficiency of the evidence for appellant's first degree murder conviction. Appellant argues there is insufficient evidence to support his conviction because he lacked a specific intent to kill victim, as he only intended to discipline her. He also observes he attempted to resuscitate victim, did not attempt to prevent mother from reporting this incident to authorities, and eventually called 911. He contends these life-saving efforts show he did not intend to kill victim.

■ In sufficiency review, we are "obliged to determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt." *Commonwealth v. Brown*, 605 Pa. 103, 987 A.2d 699, 705 (2009) (citing *Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 68 (2008)). "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Montalvo*, 604 Pa. 386, 986 A.2d 84, 92 (2009) (quoting *Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 920 (2008)). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may use solely circumstantial evidence to prove a killing was intentional. *Brown*, at 705 (quoting *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 (2008)). Specific intent to kill may be proven when a defendant knowingly applies deadly force to

another person. *Commonwealth v. Hawkins*, 549 Pa. 352, 701 A.2d 492, 500 (1997) (citing *Commonwealth v. Meredith*, 490 Pa. 303, 416 A.2d 481, 485 (1980)).

We find the Commonwealth provided sufficient evidence to prove each element of first degree murder. Appellant repeatedly hit and whipped a two-year-old child, inflicting 150 injuries over approximately 45 to 60 minutes. Those injuries caused bruises all over victim's body, including vital parts of her body such as her head and chest. Victim suffered substantial internal injuries and, ultimately, death. Thus, the jury had sufficient evidence to conclude appellant acted with malice and specifically intended to kill victim. *See, e.g., Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 493 (2009) (citing *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 196 (1997)) ("Specific intent may be proven where the defendant knowingly applies deadly force to the person of another."); *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 416–17 (2008) ("[E]xtensive physical injuries appellant inflicted on the child, his cold-hearted failure to timely seek medical assistance, and the contradictory explanations appellant offered ... were sufficient to support the inference that appellant ... intentionally, deliberately, and with premeditation killed [the victim].").

Appellant contends he merely sought to discipline victim, as evidenced by his attempts to resuscitate her. However, this argument goes to the weight, not the sufficiency of the evidence, and the jury was free to reject this explanation. *See Sherwood*, at 492 (quoting *Kennedy*, at 921) (" '[T]he trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.' "). Further, appellant's subsequent attempt to render aid to victim, even if true, does not nullify his malice and specific intent to kill. *See id.*, at 494 n. 21 (finding attempt to aid victim "does not negate specific intent to kill ... because specific intent to kill is gauged at the moment of the killing and may be formed in a split second.") (citation omitted). Accordingly, there is sufficient evidence to sustain appellant's conviction for first degree murder.

## II. GUILT PHASE CLAIMS

### A. Prior Bad Acts

██ Appellant argues the trial court erred in permitting the pathologist to testify victim had 70 injuries inflicted prior to the day she was fatally injured. He contends these injuries were not admissible to show intent, lack of mistake or accident, or other purposes, because there was no evidence he caused these prior injuries, or when or how these injuries occurred.[5]

The trial court found the testimony was admissible pursuant to Pa.R.E. 404(b)[6] to show intent, knowledge, malice, motive, and absence of accident or mistake. The court further determined the evidence was admissible to show the chain, sequence, or natural development of events forming the history of the case.

 "The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be

**5.** Appellant also faults the trial court for failing to give a contemporaneous limiting instruction. Insofar as appellant complains about the lack of a contemporaneous instruction, he waived this claim by failing to request a curative instruction. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Likewise, appellant's claim that the trial court should have *sua sponte* given a contemporaneous limiting instruction fails, as appellant provides no authority that a trial court has the duty to *sua sponte* provide contemporaneous limiting instructions. Further, the trial court did issue a limiting instruction in its guilt phase jury instructions. N.T. Trial, 11/12/09, at 772–73.

**6.** Rule 404(b) provides:
(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.
Pa.R.E. 404(b)(1)-(3).

reversed on appeal only upon a showing that the trial court committed an abuse of discretion." *Sherwood,* at 495 (citing *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 775 (2004)). " 'An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.' " *Id.* (quoting *Commonwealth v. Dillon,* 592 Pa. 351, 925 A.2d 131, 136 (2007)).

Prior acts are admissible to show ill will, motive, malice, or the nature of the relationship between the defendant and the decedent. *Id.,* at 497 (quoting *Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186, 190 (1977)). "In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." *Id.* (citing *Powell,* at 419).

Despite appellant's claims to the contrary, the Commonwealth introduced evidence showing appellant physically punished and hit victim. Indeed, appellant admitted to Sergeant Kohler he hit victim with a belt the day before, *see* N.T. Trial, 11/9/09, at 113, and told detectives he disciplined victim by beating her. These injuries show the nature of the relationship between appellant and victim, specifically, the nature and extent of his physical discipline of victim. Because this evidence was probative to show the developing relationship between appellant and victim, and as the jury already learned appellant physically disciplined her, the probative value of these injuries outweighed their prejudicial effect. Accordingly, we cannot find the trial court abused its discretion in admitting the pathologist's testimony as to victim's older injuries.

## B. Admissibility of Statements Made to Sergeant Kohler and EMT Sanders

Upon arriving at the scene, Sergeant Kohler noticed appellant near the residence, breathing rapidly and appearing

distraught. Kohler asked appellant if he was okay; appellant replied, "No, I don't feel well." *Id.,* at 111. Kohler asked appellant to come to his police cruiser to be medically examined; appellant agreed. While they were walking to the cruiser, appellant said, "I know I'm in trouble because of all the bruises all over her body. I beat her yesterday pretty bad with a belt." *Id.,* at 113. EMT Supervisor Sanders medically examined appellant in the back of the cruiser. During the examination, appellant asked how victim was doing. Sanders said they were doing everything possible for the child, and asked what happened to her. Appellant replied, "I've been beating her." *Id.,* at 148. Sanders asked, "What do you mean?"; appellant said, "I'm sorry, I did it." *Id.* Sanders asked, "What do you mean you did it?" *Id.* Appellant explained, "I have been hitting the child for the last two or three days." *Id.* Sanders then asked, "Well, what did you use on the child?" Appellant responded, "A belt." *Id.,* at 149.

Appellant argues the trial court should have granted his motion to suppress the statements he made to Kohler and Sanders. He claims he was in custody when he made these statements, but had not been given *Miranda*[7] warnings. He further alleges Sanders was acting as an agent of the government when questioning him. Moreover, appellant contends he was medically distressed at the time; thus, he was not competent to waive his rights.

The trial court held all of these statements were admissible. The court found appellant's statement to Kohler was a spontaneous utterance, not made in response to any police action. The court also determined Sanders did not act as an agent of the government, as the purpose of his questions was to provide medical treatment to appellant and obtain a medical assessment of victim. The court noted Sanders testified he was not instructed to acquire any information on behalf of law enforcement, and he shared no duties with police.

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In reviewing a suppression court's denial of a suppression motion,

we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Jones,* 605 Pa. 188, 988 A.2d 649, 654 (2010) (citing *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 842 (2003)). Nonetheless, we exercise plenary review over the suppression court's conclusions of law. *Id.* (citations omitted).

We have held "[a] person is in custody for *Miranda* purposes only when he 'is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.'" *Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 90 (2004) (quoting *Commonwealth v. Johnson,* 556 Pa. 216, 727 A.2d 1089, 1100 (1999)) (footnote omitted). "The standard for determining whether an encounter with the police is deemed 'custodial' ... is an objective one based on a totality of the circumstances with due consideration given to the reasonable impression conveyed to the person interrogated...." *Commonwealth v. Gwynn,* 555 Pa. 86, 723 A.2d 143, 148 (1998) (citing *Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078, 1085 (1993)).

The record shows appellant was not in custody when he made these statements. Appellant was walking of his own volition to the police cruiser; he was never physically restrained, and was free to refuse the offer of medical treatment. Further, appellant was not restrained while Sanders was examining him. He was free to decline treatment and leave the cruiser. Accordingly, the trial court properly held these statements were admissible.

Furthermore, although appellant contends he was too mentally distraught to understand his *Miranda* rights or intelligently waive them, this is beside the point, as we have concluded appellant was not entitled to *Miranda* warnings because he was not in custody. Therefore, the trial court properly denied appellant's motion to suppress his statements to Kohler and Sanders.

## C. Statement Made En Route to Police Station

■ When Sergeant Kohler was transporting appellant to the police station, appellant said, "That girl and her mother bruise when I touch them at all. If I bite her mother or hit [victim] at all, they bruise right up." N.T. Suppression Hearing, 4/2/09, at 22. Appellant argues this statement should have been suppressed because he had not been given a *Miranda* warning. The Commonwealth responds that Kohler did not solicit this statement; thus, suppression is unwarranted. The trial court found this statement should not be suppressed because it was a spontaneous utterance, not made in response to any police conduct or questioning.

■ *Miranda* does not preclude the admission of spontaneous utterances. *See Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 720 (1998) ("[V]olunteered or spontaneous utterances are admissible even though the declarant was not 'Mirandized.' ") (citations omitted). The record supports the trial court's finding that appellant spontaneously volunteered this statement. Indeed, appellant fails to identify any police conduct that elicited this statement. Accordingly, the trial court properly did not suppress this statement.

## D. Voluntariness of Appellant's Statements to Detectives

Appellant argues the confession he made to detectives at the police station was involuntary and should have been suppressed. Appellant contends he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights because he

was never advised the assault he was being questioned about would become a homicide charge if victim died.[8]

 "It is the Commonwealth's burden to establish whether [appellant] knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Eichinger*, at 1135–36 (citations omitted). Police, when giving someone *Miranda* warnings, are not required to inform him of all possible or hypothetical charges against him. *See Colorado v. Spring*, 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) ("[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."). Here, Kohler read appellant his rights, informing him he was being questioned in relation to an assault. The detectives reminded appellant of his rights no less than three times. Appellant expressed his understanding of his rights and indicated his desire to talk with detectives. Although appellant was never informed he could face homicide charges, he cites no legal authority indicating he was required to be informed he could face homicide charges if victim died. It was objectively reasonable for police not to inform appellant he could face homicide charges, as victim was still alive when they questioned him. Thus, the record supports the trial court's denial of suppression of appellant's statements to detectives.

### E. Search Warrants

On April 6, 2008, police obtained a search warrant for:

8. Appellant also claims his confession was tainted by his prior un-*Mirandized* custodial interrogations by Sergeant Kohler and EMT Supervisor Sanders. As we have already determined these statements were admissible, they cannot contaminate appellant's subsequent statements to detectives. *See Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1135–36 (2007) (statement made before *Miranda* warnings does not require suppression of post-warning statement when pre-warning statement was voluntary).

Items relating to assault of [victim] including but not limited to belts, cords, game controllers, sticks, bedding material, blood, hairs, fibers, fingerprints, clothing and any and all other items associated with this assault. Also photographs, and measurements of residence including exterior, and any other items or contraband found while conducting above search.

Search Warrant, 4/6/08, at 1. This warrant was supported by the following affidavit of probable cause:

On 4/6/2008 Officers responded to an assault call at [residence] concerning a 2[-]year[-]old victim. Upon arrival they observed a severely beaten child, who appeared purple in color and the mother was attempting CPR. Officers took over to [sic] CPR and when ambulance personnel arrived the child was taken to York Hospital Trauma for treatment. The mother's boyfriend was also home at the time of the assault. Both the mother ... and the boyfriend ([appellant]) were taken to the station, [M]irandized by Officer's [sic] and questioned as to how the child came to be in that condition. The mother stated that [appellant] had taken the child into the middle bedroom and she could hear him beating the child. At one point he came out with a game controller and cord which she believed he was using to whip the child. He then went back into the room and this continued in her estimation for an hour. Then suddenly all the crying stopped and she heard bath water running. [Appellant] and the child were now in the bathroom and still Mom did not investigate. Shortly thereafter [appellant] carried the limp child to her mother and she began CPR for a period of at least an hour. Mother also stated that the beatings were going on for at least 2 months prior to today. Both parties gave conflicting stories as to how the assault happened from a fall down the stairs, to a slip in the bathtub, and mom's story of the bedroom beating by [appellant]. At this point the child is in critical condition at York Hospital.

Based on this information this Officer requests that a search warrant be issued for the residence to look for and obtain

any evidence related to this assault. I also request to be able to take the bloody clothing being worn by the mother ... and [appellant].

*Id.,* at 2. Police subsequently obtained a second search warrant for:

Items with evidentiary value related to homicide of [victim] specifically; [sic] a cutout section of the north wall in the middle bedroom on the 2nd floor, (area of blood splatter pattern), a black Timberland boot in the middle bedroom on the 2nd floor, and swabs and/or collection of blood from bathroom tub area.

Search Warrant, 4/9/08, at 1. The affidavit of probable cause supporting this warrant stated:

On 4/6/2008 a serious assault occurred on a 2[-]year[-]old child resulting in a Homicide.... As a result of this, a search warrant was obtained and the residence was processed by this Officer and items of evidentiary value were collected and photographed. On 4/8/2008 an autopsy was performed ... and this Officer attended and collected evidence and photographs as well. After the autopsy Officer's [sic] met with members from the DA's [O]ffice to discuss the case. After reviewing the photographs from the scene and the autopsy it was determined that additional items of evidence should be collected from the scene. Specifically ... a photograph with a measured scale of blood spatter pattern located on the north wall of the 2nd floor middle bedroom should be further collected. We would like to cut out that section of the wall so an expert could make a determination as to the pattern. That would also preserve the pattern for that expert prior to taking any swabs for potential comparison later. There were also marks on the victim's face which did not coincide with the [Xbox] controller.... Inside that 2nd floor bedroom was a black Timberland boot which we would like to collect for further comparison to those injuries. And finally the suspect made statements about washing the child off in the bathtub to try and revive her. We would like to further examine the

tub for the presence of blood by using chemical enhancement and photographs.

All this information came to this Officer after the initial search warrant was served as a result of a consultation with the DA's Office, a blood spatter expert and findings from the autopsy. BAsed [sic] on this information this Officer requests that a 2nd warrant be issued for this residence to obtain the above (3) mentioned items.

*Id.,* at 2. Appellant moved for suppression of the evidence obtained pursuant to these warrants, which the trial court denied.

Appellant argues the trial court should have suppressed evidence obtained pursuant to these search warrants. He claims both warrants fail to establish sufficient probable cause, because the first search warrant's affidavit does not show what injuries victim suffered to corroborate mother's account of the beating. He further alleges the second affidavit fails to detail victim's injuries, explain how victim's bleeding caused blood spatter, define or explain blood spatter, and indicate how injuries to victim are consistent with the boot. Further, appellant contends the first warrant fails to specify with particularity what was to be seized from his residence.

The Commonwealth responds the first affidavit showed appellant assaulted victim, and evidence of that assault would likely be found in the residence. The Commonwealth contends the items seized were described as specifically as possible. It claims the second affidavit referenced information obtained through photographs of the residence and the autopsy, and indicated the need to obtain additional spatter evidence and the boot. The trial court found there was a substantial basis to find probable cause existed for both warrants and denied appellant's motion to suppress evidence obtained pursuant to the search warrants.

 Search warrants must be supported by probable cause. *Jones,* at 655. " 'Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in

themselves to warrant a man of reasonable caution in the belief that a search should be conducted.'" *Id.* (quoting *Commonwealth v. Thomas,* 448 Pa. 42, 292 A.2d 352, 357 (1972)). In considering an affidavit of probable cause, the issuing magistrate must apply the "totality of the circumstances test" which requires her to "make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit ... including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Sherwood,* at 503 (quoting *Commonwealth v. Torres,* 564 Pa. 86, 764 A.2d 532, 537 (2001)) (internal citation and quotations omitted). A court reviewing a search warrant determines only if a substantial basis existed for the magistrate to find probable cause. *Id.* (quoting *Torres,* at 537–38).

Reviewing the affidavits here, we find the trial court properly concluded there was a substantial basis for the issuing magistrate to conclude probable cause existed. In the initial affidavit, police indicated victim had been injured, the injury occurred at the residence, mother indicated appellant assaulted victim, there were conflicting accounts of how victim had been injured, and there was likely to be evidence pertaining to the injury in the residence. *See id.* (probable cause for search warrant existed when child was "found unconscious under suspicious circumstances inside the residence, ... injuries observed on the child's body were numerous and severe, ... [Sherwood] had given many contradictory versions of what had occurred to the child to cause her injuries, and ... the child's mother accused [Sherwood] of having recently abused the child."). Likewise, the second affidavit contains sufficient probable cause, as it indicated victim died after being assaulted, and the prior search uncovered blood spatter that may have come from victim. Further, the affidavit indicated another object was used to beat victim, giving police cause to seize the boot to determine if the boot was that object.

Appellant further argues police improperly attempted to bolster the second affidavit by noting they had consulted the

District Attorney's Office and a blood spatter expert, failed to explain the relevance of the items sought in the second affidavit, and did not explain the science of blood spatter. However, appellant cites no authority to support this argument. Thus, appellant fails to prove there was an insufficient basis for the issuing magistrate to find this second affidavit provided probable cause to support the second search warrant.

 Additionally, the initial search warrant was not overbroad. The police were searching for items related to the assault; thus,

> the warrant had to be sufficiently broad to encompass all of the items that possibly could contain material of evidentiary value ... "where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item. . . ."

*Id.*, at 504–05 (quoting *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510, 514 (1971)). Here, police were not certain as to the details of the assault and could not know exactly what to specify in the warrant application. Thus, they needed only to describe the class of items to be seized, and the first search warrant was sufficiently specific. Furthermore, the second search warrant was not overbroad, as it actually identified the items to be seized—specifically, blood samples, a section of wall, and a boot. Appellant is entitled to no relief on his search warrant claims.

## F. Appellant's Request to be Excused from Trial

During the trial testimony of the nurse and the pathologist, the Commonwealth introduced 18 photographs the nurse took of victim's injuries.[9] The trial court denied appellant's request to be excused from the courtroom during this testimony.

Appellant contends he properly waived his right to be present during trial. *See Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435, 447–48 (1994) (appellant who engaged in

___

9. Appellant's challenge to the admission of these photographs is discussed in Part II.G., *infra*.

outbursts demanding to be removed from courtroom knowingly and voluntarily waived right to be present). He notes during the nurse's and the pathologist's testimony, he laid his head flat on counsel's table, stuffed his ears with cotton, plugged his fingers in his ears, and rocked himself back and forth. He claims these attempts to avoid seeing the photographs prejudiced him.

The Commonwealth argues as this was a capital trial, appellant cannot exclude himself from his trial. *See Commonwealth v. Ford,* 539 Pa. 85, 650 A.2d 433, 440 (1994) ("When charged with a capital offense, a defendant's right to be present at his own trial is transformed into an obligation because of the gravity of the potential outcome.") (citation omitted). Distinguishing *Wilson,* the Commonwealth notes appellant was not disruptive and *Wilson* did not decide whether a defendant can request to be absent from trial. The Commonwealth contends appellant's claim of prejudice is wholly speculative. The trial court found *Ford* prevented appellant from excusing himself from trial; accordingly, it denied appellant's request.

Pennsylvania law provides that capital defendants have an obligation to be present at their trials. *Id.; see also* Pa.R.Crim.P. 602(A) ("The defendant shall be present at every stage of the trial ..."); *Commonwealth v. Diehl,* 378 Pa. 214, 107 A.2d 543, 544 (1954) (presence of capital defendant necessary at trial). Petitioner's reliance on *Wilson* is inapposite, as Wilson was removed from his trial only after he disrupted proceedings. *Wilson,* at 447–48. Here, appellant did not disrupt his trial; thus, *Wilson* is inapplicable. Accordingly, the trial court applied *Ford,* and refused to permit appellant to ignore his obligation to be present at his capital trial. Thus, the trial court's refusal to allow appellant to absent himself from the courtroom does not entitle him to relief.

## G. Photographs of Victim

Appellant argues the trial court erred in admitting 18 photographs taken of victim's injuries while she was being

treated at York hospital. Appellant alleges the photographs
were prejudicial, inflammatory, and of limited probative value.
He claims the nurse and the pathologist could have adequately
described the injuries, and the photographs were not neces-
sary to support the pathologist's determination that multiple
traumatic injuries caused victim's death. He observes the
only issue at trial was whether he possessed a specific intent
to kill victim. Appellant also claims one of the photographs
was particularly prejudicial, as it showed medical instruments
going into victim's body, implying victim suffered pain from
the efforts to save her life.

The Commonwealth, conceding these photographs may be
inflammatory, argues they had essential evidentiary value, and
were particularly relevant to determining whether appellant
had a specific intent to kill victim. The Commonwealth sub-
mits it would have been impossible for either the nurse or the
pathologist to verbally describe victim's 220 injuries.

The trial court found the photographs, which were in black
and white, were useful in understanding the pathologist's
testimony regarding victim's wounds. The court noted it
issued a cautionary instruction to the jury about the nature of
the photographs, limited the period for view, and did not allow
the photographs to be taken into jury deliberations.

 We will affirm a trial court's admission of photo-
graphs absent an abuse of discretion. *Commonwealth v.
Pruitt*, 597 Pa. 307, 951 A.2d 307, 319 (2008) (citing *Common-
wealth v. Solano*, 588 Pa. 716, 906 A.2d 1180, 1191 (2006)).
Further,

When considering the admissibility of photographs of a
homicide victim, which by their very nature can be unpleas-
ant, disturbing, and even brutal, the trial court must engage
in a two-step analysis:

First a [trial] court must determine whether the photo-
graph is inflammatory. If not, it may be admitted if it
has relevance and can assist the jury's understanding of
the facts. If the photograph is inflammatory, the trial
court must decide whether or not the photographs are of
such essential evidentiary value that their need clearly

outweighs the likelihood of inflaming the minds and passions of the jurors.

*Id.* (quoting *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 531 (2003)). Appellant admits whether he specifically intended to kill victim was a central issue at trial. As "photographic images of a homicide victim are often relevant to the intent element of the crime of first-degree murder," *id.* (citing *Solano*, at 1191), the nature and extent of victim's injuries were relevant to show whether appellant had a specific intent to kill her. The photographs were necessary to explain the nature and extent of victim's injuries, which could not be fully explained through testimony. Even if the nurse and the pathologist could have testified as to these injuries, a witness's ability to testify as to the condition of the body does not render photographs *per se* inadmissible. *See, e.g., id.* (rejecting argument that autopsy photographs were cumulative of witness testimony); *Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557, 560 (1994) ("[E]ven where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.") (citations omitted). While these photographs may be inflammatory, having reviewed them, we determine the trial court did not abuse its discretion in finding their essential evidentiary value outweighed the likelihood they inflamed the jurors' passions. While some photographs depict medical equipment, the photographs have evidentiary value in showing the nature and extent of victim's injuries. Further, despite appellant's suggestion, he fails to prove how the presence of medical equipment implies victim was in pain. Further, the trial court reduced any risk these photographs inflamed the jury by prohibiting the jury from taking them into deliberations and issuing cautionary instructions. *See Pruitt*, at 319 (noting appropriate instruction can minimize danger of inflaming jury) (citations omitted). Accordingly, we cannot say the trial court abused its discretion in admitting these photographs.

## H. Use of Photographs in Mother's Testimony

 Mother, during her testimony, was shown 15 of the photographs of victim's injuries. From these photographs,

which were not republished to the jury, mother indicated which of victim's injuries were not present before April 6, 2008, the day of the fatal beating.

Appellant argues mother lacked personal knowledge to authenticate the photographs. Appellant notes mother was not an expert and could not distinguish between fresh and preexisting injuries, and mother already testified as to those preexisting injuries of which she had personal knowledge.

The Commonwealth alleges these photographs were useful in allowing mother to distinguish between victim's preexisting injuries and those that resulted from appellant's assault on April 6, 2008. The Commonwealth contends appellant failed to develop his claim there was no foundation for this use of the photographs. The trial court determined the Commonwealth laid a proper foundation for these pictures and found they allowed the witness to differentiate victim's preexisting injuries.

Appellant essentially argues the Commonwealth failed to establish a foundation for mother's testimony regarding the photographs. Here, the photographs were used to show which of victim's injuries predated the day she was fatally injured. Differentiating the injuries victim suffered the day of the murder was relevant to appellant's intent. Appellant's argument that these photographs showed he had beat up victim on prior occasions is misplaced, as the photographs were only used to show which injuries victim incurred on the day of the murder. Mother had personal knowledge of which of victim's injuries predated the date of the murder, as she lived with victim, and she did not have to be an expert to testify as to which injuries she personally knew of. Accordingly, appellant cannot show the trial court abused its discretion in permitting mother to review these photographs.

## I. Hearsay

At trial, Police Sergeant Michael Koltunovich testified a detective "believed that [the Timberland boot] may have been used in the assault." N.T. Trial, 11/9/09, at 205. Appel-

lant objected, contending the detective's out-of-court state-
ment was hearsay. The trial court overruled the objection.

Appellant contends the statement was inadmissible hearsay
because it was effectively indistinguishable from the truth of
the matter asserted. The Commonwealth argues the police
officer was merely recounting why he collected the boot from
the residence. The trial court determined this statement was
given as the reason police collected the boot and thus was not
hearsay.

 " 'Hearsay' is a statement, other than one made by
the declarant while testifying at the trial or hearing, offered in
evidence to prove the truth of the matter asserted." Pa.R.E.
801(c). Thus, any "out of court statement offered not for its
truth but to explain the witness's course of conduct is not
hearsay." *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997,
1017 (2007) (citing *Commonwealth v. Sneed*, 514 Pa. 597, 526
A.2d 749, 754 (1987)). Here, Koltunovich explained he collect-
ed the boot because a detective believed the boot may have
been used in the assault. Thus, this statement was properly
used to explain Koltunovich's course of conduct in seizing the
boot. Appellant's hearsay claim is meritless.

## J. Voluntary Manslaughter Instruction

Appellant contends the trial court should have instructed
the jury on voluntary manslaughter.[10] He claims victim woke
him up "at 5:00 A.M. and her diaper 'exploded.' Immediately

10. The voluntary manslaughter statute provides:
 (a) **General rule.** A person who kills an individual without lawful
 justification commits voluntary manslaughter if at the time of the
 killing he is acting under a sudden and intense passion resulting from
 serious provocation by:
 (1) the individual killed; or
 (2) another whom the actor endeavors to kill, but he negligently or
 accidentally causes the death of the individual killed.
 (b) **Unreasonable belief killing justifiable.** A person who intentional-
 ly or knowingly kills an individual commits voluntary manslaughter if
 at the time of the killing he believes the circumstances to be such
 that, if they existed, would justify the killing under Chapter 5 of this
 title, but his belief is unreasonable.
 18 Pa.C.S. § 2503(a)-(b).

thereafter, [appellant] began hitting [victim]." Appellant's Brief, at 52 (citations omitted). He claims he intended merely to discipline victim and attempted to resuscitate her by rubbing her stomach, shaking her, placing her in a bathtub, and eventually calling 911. He argues this evidence supports a voluntary manslaughter charge, as it shows he acted in a sudden rage or heat of passion.

The Commonwealth argues the jury, because it convicted appellant of first degree murder, would never have addressed voluntary manslaughter. The Commonwealth further claims appellant did not show he was provoked in a manner justifying a heat of passion voluntary manslaughter charge. The trial court found appellant was not entitled to a voluntary manslaughter charge because there was no evidence to support the theory that appellant killed victim in the heat of passion.

When reviewing a challenge to a jury instruction, we review the charge as a whole to ensure it was a fair and complete statement of the law. *Montalvo*, at 99 (quoting *Commonwealth v. Saunders*, 529 Pa. 140, 602 A.2d 816, 818 (1992)). This Court has explained:

"[A] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict." To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, Appellant acted under a sudden and intense passion resulting from serious provocation by the victim.

*Id.*, at 100 (internal citations omitted) (emphasis omitted). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 315 (2011) (quoting *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638, 651 (2009)). Whether provocation is sufficient is determined objectively. *Id.*, at 314–15. After reviewing the record, there is no evidence victim sufficiently provoked appellant to create a sudden and intense

passion in him, or that any such provocation caused him to kill victim. While an early wake-up and dirty diaper may be unpleasant, appellant does not show how this provoked him into a sudden and intense passion. The alleged provocation occurred at 5:30 a.m., but appellant assaulted victim around 12:30 p.m.; there is no evidence showing appellant was still acting under a serious and intense passion at this time. Accordingly, the trial court properly refused to instruct the jury on voluntary manslaughter.

## III. PENALTY PHASE CLAIMS

### A. Pathologist's Testimony During Penalty Phase

 During the penalty phase, the Commonwealth recalled the pathologist to testify victim would have felt severe pain from appellant's assault. Appellant argues the pathologist should not have testified at the penalty phase, as expert testimony was not necessary for the jury to understand victim's injuries were painful. He further suggests the pathologist's opinion was unnecessary, as there was already evidence presented, from mother's testimony that victim was crying, that victim suffered pain. Appellant claims this testimony was cumulative of evidence entered in the guilt phase and tended to inflame the jury's passions. He contends any probative value of the pathologist's testimony was outweighed by the prejudicial effect of the pathologist recounting victim's injuries.

The Commonwealth submits the pathologist's penalty phase testimony was limited to the pain victim suffered, which is relevant to establishing the torture aggravator. The Commonwealth contends this testimony was not cumulative, as it focused on victim's pain and suffering. The trial court ruled the pathologist's expert testimony regarding victim's pain and suffering was admissible.

 As explained in Part IV, *infra*, when the Commonwealth asserts the torture aggravator, it carries the burden of proving the defendant acted with " 'an intent to cause pain and suffering in addition to the intent to kill.' " *Sherwood*, at 506

(quoting *Powell*, at 425). Thus, the pathologist's testimony was not merely cumulative of guilt phase evidence, as his penalty phase testimony was probative of the extent of the pain victim suffered, not whether appellant specifically intended to kill victim. The pathologist also testified the beating took at least 45 minutes, which is relevant to show the duration of the beating, one of the factors in determining whether the torture aggravator applies. *See Montalvo*, at 110.[11]

Appellant also claims the pathologist's testimony was unnecessary, as the jury could have already determined victim endured pain. However, appellant merely argues the jury would have inferred victim was in pain by her injuries and her crying. Nonetheless, the pathologist's testimony is useful in explaining the type of pain such injuries actually caused, instead of requiring the jury to infer the injuries were painful.[12] As the pathologist's testimony was probative of the torture aggravator, we find his testimony was relevant and not unduly prejudicial, and thus properly admitted.

## B. Direct Examination of Appellant's Mother

During the penalty phase, appellant's mother testified for appellant. During her direct examination, the following occurred:

[Appellant's counsel]: What do you think about what [appellant] did in this case?

[Commonwealth]: Your Honor, I'm going to object.

THE COURT: Sustained.

11. Indeed, this Court has previously held a trial court did not abuse its discretion in allowing a forensic pathologist to testify in the penalty phase where the Commonwealth sought to prove the torture aggravator. *See Baez*, at 727–28 (holding trial court properly permitted pathologist to testify as expert in penalty phase).

12. Additionally, merely because other evidence can prove victim suffered pain does not *per se* prohibit the Commonwealth from introducing the pathologist's testimony to prove victim suffered pain. *Cf. Old Chief v. United States*, 519 U.S. 172, 186; 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[Generally] the prosecution is entitled to prove its case by evidence of its own choice.").

[Appellant's counsel]: How does it make you feel that two of your children have been convicted of murder?

[Appellant's Mother]: I'm crazy. I feel like the worst person in the whole world.

[Appellant's counsel]: Why?

[Commonwealth]: I'm going to object. Again, personal opinion.

THE COURT: Defense?

[Appellant's counsel]: It's the penalty phase. I'm just trying to elicit as much as I can so the Jury has a flavor for what we're looking at here.

THE COURT: Sustain the objection.

N.T. Sentencing Hearing, 11/16/09, at 79–80. Appellant claims the trial court erred in sustaining this objection because he, as a capital defendant, was entitled to present all relevant evidence in mitigation, including his mother's testimony.

The Commonwealth responds this evidence was inadmissible "third party impact" testimony, which was irrelevant to appellant's character, record, or circumstances. The trial court found appellant sought his mother's personal opinions as to what she thought about his actions and how those actions affected her. The trial court allowed appellant's mother to testify factually, but not assert her personal opinion.

We will not reverse a trial court's ruling on the admissibility of evidence absent an abuse of discretion. *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 819 (2007). A capital defendant may offer, as mitigating evidence, "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). However, appellant's mother's testimony as to how she felt regarding her sons being murderers is irrelevant to appellant's character or record or the circumstances of his offense. Thus, it is not relevant to Pennsylvania's capital sentencing statute. *See, e.g., Montalvo,* at 98–99 (quoting *Powell,* at 426–27) (concluding, as mercy is irrelevant to defendant's character, record, or circumstances of offense, trial court properly excluded four witnesses who would have

merely asked jury to spare defendant's life); *Bomar*, at 852 (holding witness's personal views on death penalty irrelevant to capital sentencing, as it is not evidence concerning defendant's character, record, or circumstances of his offense); *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1054 (2002) ("[T]estimony concerning the impact [of the offense] on third parties had no bearing on appellant's character or record or the circumstances of the offense."). Accordingly, the trial court did not abuse its discretion in prohibiting appellant's mother from offering irrelevant testimony regarding how appellant's offense affected her.

## C. Jurors' Notes

During both the guilt and penalty phases, the trial court permitted jurors to take notes.[13] The court, over appellant's objection, permitted the jurors to take their guilt phase notes into their penalty phase deliberations.

Appellant claims the jurors' use of guilt phase notes in the penalty phase deprived him of a fair trial. He contends the notes likely contained summations of guilt phase evidence, irrelevant to the penalty phase, allowing the jury to consider inadmissible evidence.

The Commonwealth argues the trial court properly permitted the jury to use its guilt phase notes; as the record from the guilt phase was incorporated into the penalty phase, the jury should have been able to rely on its notes from both phases. The Commonwealth further alleges appellant failed to prove the notes prejudiced him.

Trial courts are required to allow juries to take notes for trials expected to last more than two days, and may allow juries to take notes for shorter trials. Pa.R.Crim.P. 644(A). Further, "jurors shall be permitted to have their notes for use during deliberations." *Id.*, 646(D). Here, appellant did not object to incorporating the guilt phase record into the penalty

---

13. Until the amendment of Pa.R.Crim.P. 644 in 2005, Pennsylvania did not allow note-taking by jurors. *See Commonwealth v. Neff*, 860 A.2d 1063, 1076 (Pa.Super.2004) (Beck, J., concurring) (noting then-existing Pa.R.Crim.P. 644 prohibited jurors from taking notes).

phase or allowing the jury to take notes in the penalty phase, and only objected to jurors using guilt phase notes in the penalty phase. Thus, the trial court allowed the jury to use its notes from the guilt phase to assist in its penalty phase deliberations. Appellant merely speculates the notes contained summations of evidence irrelevant to the penalty phase. However, appellant cites no authority for the proposition that guilt phase evidence may not be incorporated into the penalty phase, and does not even identify any guilt phase evidence which was inadmissible in the penalty phase. Given these circumstances, appellant fails to prove the trial court improperly permitted the jury to use its guilt phase notes in the penalty phase.

## D. Appellant's Penalty Phase Closing Argument

 Appellant's counsel said the following during his penalty phase closing argument:

So I'm not asking that you guys give him a free pass, and I'm not requesting forgiveness for [appellant]. [Life imprisonment] is as a severe punishment and penalty as exists. [Appellant] will be in a cell that is probably 8 by 10 for the rest of his life. Okay. This isn't *The Shawshank Redemption,* where he's going to be roommates with Phil [sic] Robbins or Morgan Freeman and they're going to sing songs and Kum–By–Ya and warm fuzzy things. He's going to be in a men's penitentiary, and let me tell you, in there, there is a code. You know what people do to child killers?

N.T. Sentencing Hearing, 11/16/09, at 128. The Commonwealth objected to this argument, and the trial court sustained the Commonwealth's objection.

Appellant argues his counsel was entitled to latitude in arguing in favor of life imprisonment, and counsel was stressing that life imprisonment was a substantial and proportionate sentence for his crime. The Commonwealth responds that the trial court properly prevented appellant from appealing to the jury for sympathy, passion, or prejudice. The Commonwealth notes what happens to child killers in prison is not related to any of the statutory mitigating circumstances. The trial court

reasoned it allowed great latitude to appellant's counsel during closing argument.

 "Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony." *Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 309 (1987) (quoting *Commonwealth v. Fairbanks*, 453 Pa. 90, 306 A.2d 866 (1973)). However, there is no evidence in the record concerning the prison conditions, well-regarded motion pictures, or the treatment of child killers in prison. Accordingly, there was no evidentiary basis for this argument. We are thus unable to conclude the trial court abused its discretion in sustaining the Commonwealth's objection to this closing argument.

## IV. STATUTORY REVIEW

 Having determined appellant is not entitled to relief on his appellate claims, our death penalty statute requires us to review the death sentence to determine if: "(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(3)(i)-(ii).

Here, the jury found two aggravating circumstances: the offense was committed by means of torture, *id.*, § 9711(d)(8), and victim was a child under the age of 12. *Id.*, § 9711(d)(16). The Commonwealth has the burden to prove the existence of an aggravating circumstance beyond a reasonable doubt. *Id.*, § 9711(c)(1)(iii). As victim had just turned two years old, she was clearly under the age of 12 when appellant murdered her.[14] As for the torture aggravating circumstance, we have explained:

> To establish that a murder was committed by means of torture, the Commonwealth must show that the defendant "intentionally inflicted ... a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or

14. Indeed, at the penalty phase, appellant stipulated victim was a child under 12 years of age. N.T. Sentencing Hearing, 11/16/09, at 104.

cruel, manifesting exceptional depravity." "Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill." The intent to torture may be proven from the circumstances surrounding the killing. This Court has listed the factors to be considered in determining whether the torture aggravator applies as including, but not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. In reviewing a jury's finding of torture, this Court examines the evidence in the light most favorable to the Commonwealth, and draws all reasonable inferences in its favor.

*Montalvo*, at 109–10 (quoting *Powell*, at 425) (internal citations omitted). Here, appellant inflicted approximately 150 wounds on victim with multiple weapons, including whipping victim with a cord. Appellant beat victim to the extent she bled onto a bedroom wall. The pathologist testified victim suffered massive swelling over most of her body and deep internal bleeding in her brain, as well as injury to her pancreas, lungs, and heart. The pathologist indicated victim suffered severe sharp pain to her chest, coughed up blood, and endured a severe headache from her brain injuries. The wounds were inflicted to both vital and non-vital areas of her body, as her injuries covered her entire body. Mother heard victim cry during the assault, indicating victim was conscious while appellant was injuring her. Further, the assault lasted an extended period of time, as the pathologist opined it lasted at least 45 minutes, and mother testified the assault lasted 20 to 30 minutes. Also, "given the size disparity between the victim and [a]ppellant, one can infer that it was [a]ppellant's intent to 'torture' the victim as he easily could have killed her with one quick blow." *Sherwood*, at 506 (citation omitted). There is sufficient evidence for a jury to find appellant intended to inflict unnecessary pain supporting the aggravating circum-

stance of torture. Therefore, we conclude sufficient evidence supports both aggravating circumstances in this case.

Finally, after careful review of the record, we find appellant's death sentence was not the product of passion, prejudice, or any other arbitrary factor. Thus, we affirm appellant's conviction of first degree murder and his death sentence.

The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor. *See* 42 Pa.C.S. § 9711(i).

Judgment of sentence affirmed.

Chief Justice CASTILLE, Justices SAYLOR, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.