J-S71035-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARVIN ALSBROOK | : | |
| | : | |
| Appellant | : | No. 1577 EDA 2018 |

Appeal from the Judgment of Sentence Entered December 15, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006191-2014

BEFORE:  BOWES, J., MURRAY, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MAY 5, 2020**

Marvin Alsbrook appeals from his judgment of sentence, imposed on December 15, 2017, following a jury trial resulting in convictions for aggravated assault, carrying firearms without a license, and carrying firearms in public in Philadelphia.[1] Alsbrook was also found guilty of possession of a firearm by a prohibited person[2] in a bifurcated bench trial. Alsbrook challenges certain evidentiary rulings and the denial of his motion to suppress. We affirm.

The relevant facts are as follows:

> Officer Michael Walker testified that on December 19, 2013, he responded to a call concerning shots fired at 3900 Fairmount Avenue, Philadelphia, Pennsylvania. The call came in from a beauty salon where there were 15 to 20 women waiting for police. Upon arriving at the scene Officer

---

[1] 18 Pa.C.S.A. § 2702(a), 18 Pa.C.S.A. § 6106(a)(1), 18 Pa.C.S.A. § 6108, respectively.

[2] 18 Pa.C.S.A. § 6105(a)(1).

Walker put out a flash for "Marvin and Little Reese" who had allegedly been involved in the shooting based on information received. Officer Walker stated that he knew the individuals in the salon and the suspects due to daily calls. Officer Walker wrote in his investigation report that fired cartridge casings (FCC's) were found on the north side of Fairmount Avenue along with a video from a nearby camera facing Union Street. At this point, Officer Walker also heard from Officer DiDomenico that Marvin Alsbrook was seen at Union and Mellon Streets. Officer Walker noted that bullet holes were found in and around a nearby house on 40th [S]treet.

Officer Walker testified that he left the scene and went half a block to Union and Mellon Streets as he had previously observed [Alsbrook] at this location on numerous occasions. A number of officers were already at the location when he arrived and the house had been secured. Officer Walker testified that Detective Zerwick asked the owner if anyone had entered the house; she stated that no one had entered and gave officers consent to search the house. Officer Walker did not conduct the search, but remained on the porch to secure the property.

On cross-examination, Officer Walker stated that he did not see [Alsbrook] nor a gun when he arrived at the scene, and that an individual in the salon who did not give their name told him that Marvin Alsbrook was one of the shooters.…On re-direct examination, Officer Walker explained that no one on the street wanted to cooperate with him or provide him with information regarding the shooting.

…

Detective Justin Falcone testified that he knew [Alsbrook] through dozens of past encounters and would associate the area of Fairmount and Union with him and that Detective Antonini requested that Detective Falcone review the video to determine if he recognized anyone. Detective Falcone said that he recognized [Alsbrook] instantly due to the way he runs, which he knew because of his many hours conducting surveillance on the 600 block of Union Street. On cross-examination, Detective Falcone asserted that he viewed the video on December 19, 2013 and subsequently emailed Detective Antonini that [Alsbrook] was the individual in the video on March 29, 2014.

Detective Richard Antonini testified that he helped to process the crime scene and obtain video footage of the crime. He explained that Detective Wilson recovered the video from the nearby mini-mart and that six .380 caliber FCC's were recovered from the sidewalk near 3951 and 3945 Fairmount Avenue. The video was viewed on location and then a search warrant for 650 Union Street was obtained and executed. Detective Antonini reviewed the search warrant to refresh his memory and clarified that the address was 659 Union Street. Detective Antonini testified that he gave [Alsbrook] Miranda warnings at Southwest Detectives Division and that [Alsbrook] gave a statement indicating that the incident was in self-defense but that he did not wish to "go on paper." [Alsbrook's] clothing was then collected and submitted to the forensic lab.

On cross-examination, Detective Antonini testified that (1) he did not arrive on the scene immediately, (2) a gun nor bullets were ever recovered during the search, (3) the only evidence related to the shooting found at 659 Union Street was [Alsbrook], and (4) [Alsbrook's] statement was not recorded. Detective Antonini also testified that to the best of his recollection, the clothing in the case came from outside [Alsbrook's] cell at Southwest Detectives, but that he previously testified that Officers McCleod and Walker had recovered clothing from 659 Union Street. In any event, the clothing, a green polo shirt and an Abercrombie sweatshirt, was placed on Property Receipt 3135187 and submitted for forensic testing. Detective Antonini asserted that he did not test [Alsbrook's] hands because of the lapse in time between the shooting and [Alsbrook's] appearance at the police station. But that, based on his experience, clothing would take in the gun shot residue.…Detective Antonini also clarified that he advised [Alsbrook] of his rights, told him the potential charges against him, and asked him if he wished to make a statement, to which [Alsbrook] refused and replied that he had acted in self-defense.

…

[T]he Commonwealth called expert witness and forensic scientist Gamal Emira, who tested [Alsbrook's] clothing for gunshot residue. He testified that of the eight gunshot residue tests that were conducted on [Alsbrook's] green

polo shirt and sweatshirt, all came back positive for gunshot residue.

Trial Court Opinion, 2/8/19, at 2-8 (internal citations to the trial transcript omitted).

Prior to trial, on November 28, 2016, the trial court denied Alsbrook's motion to suppress his alleged statements that he made to Detective Antonini after his arrest, stating "it was self-defense." The matter proceeded to trial from October 11 to 17, 2017, after which Alsbrook was found guilty as above. The court later sentenced Alsbrook to an aggregate term of seven to 14 years in prison. Alsbrook filed a motion for reconsideration of sentence, which the court denied. This timely appeal followed.

Alsbrook raises three issues for our review:

1. Did the trial court err, abuse its discretion, and/or make a mistake of law when it denied Appellant's objection to Detective Falcone's testimony about the way the Appellant ran?

2. Did the trial court err, abuse its discretion, and/or make a mistake of law when it allowed the Commonwealth to introduce expert testimony from the Commonwealth's gunshot expert after the Commonwealth failed to disclose discovery containing this expert's scientific laboratory reports prior to the commencement of trial and their case-in-chief which were required disclosures?

3. Did the trial court err, abuse its discretion, and/or make a mistake of law when it issued an order and denied Appellant's Motion to Suppress alleged statements made to Detective Antonini?

Alsbrook's Br. at 2.

Alsbrook first contends that the trial court erred when it allowed Detective Falcone to testify about Alsbrook's running style. Alsbrook's Br. at 17. Alsbrook argues that although Detective Falcone identified Alsbrook based on his running style after reviewing the surveillance video, "[i]t strains credibility, that [Detective Falcone] could immediately know a masked individual was [Alsbrook] but could not see another person discharging a firearm." *Id.* at 20. Alsbrook further argues that this testimony prejudiced the jury because the "implication is that [Alsbrook] was being surveilled for hours in relation to numerous on-going drug sales/distribution investigations." *Id.* According to Alsbrook, Detective Falcone's statement had no objective basis and was used to bias Alsbrook. *Id.* at 21.

It is well-settled that "[t]he admission of evidence is a matter vested in the sound discretion of the trial court, whose decision thereon can only be reversed by this Court upon a showing of an abuse of discretion." *Commonwealth v. Jones*, 683 A.2d 1181, 1193 (Pa. 1996). "The threshold inquiry with the admission of evidence is whether the evidence is relevant." *Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa.Super. 2013) (citation omitted). Generally, "all relevant evidence, *i.e.*, evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility." *Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007). In assessing whether certain evidence should be admitted, "the trial court must weigh the relevance and probative value of such evidence

against the prejudicial impact of that evidence." *Jones*, 683 A.2d at 1193. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 (comment). "Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa.Super. 2009) (citation omitted).

At trial, Detective Falcone testified that he was asked by Detective Antonini to review the surveillance video of the shooting to see if he recognized anyone in the video since he frequently did surveillance in the area of the shooting. N.T., 10/11/17, at 62-63. Detective Falcone stated that he immediately recognized Alsbrook as the person in the video since he had previously been in contact with Alsbrook "dozens" of times. *Id.* at 62-64. When the Commonwealth asked Detective Falcone if he ever saw Alsbrook run before, Alsbrook's counsel objected based on relevance. *Id.* at 64. The prosecutor explained that she was asking the Detective whether he had seen Alsbrook run before to see if he could compare him to the individual that was running in the video. *Id.* The trial court overruled the objection and Detective Falcone responded as follows:

[Detective Falcone]: I was in narcotics surveillance, so I did surveillances throughout the district and I've done hours upon hours of surveillance on the 600 block of Union Street where I had observed Mr. Alsbrook just goofing around, running around with his friend, like, playing basketball and stuff. They used to have a basketball net out there. That's the only time that comes to mind where I would have seen him run.

[The Commonwealth]: And how does it compare to the person in the video?

[Detective Falcone]: Everything about the way he walks, the way he ran, everything about it just brings me to who it was. It really was no question in my mind. I knew who it was.

*Id.* at 65.

Upon review, we discern no abuse of discretion in the admission of Detective Falcone's testimony regarding Alsbrook's running style. The testimony was directly relevant to establishing the identity of the shooter in the video. We agree with the trial court that the "subsequent questions asked by the Commonwealth regarding whether the Detective had seen [Alsbrook] run in the past and how it compared to the individual in the video are relevant as they make a material fact at issue more or less likely in accordance with Rule 403." Trial Ct. Op., 2/8/19, at 22. Moreover, Alsbrook's contention goes to the weight of the testimony, not its admissibility. It was the province of the jury to believe all, part, or none of the evidence presented and the weight to afford the evidence. *See Commonwealth v. Henkel*, 938 A.2d 433, 438 (Pa.Super. 2007).

Further, we find that Alsbrook's argument that Detective Falcone's statement was prejudicial because it implied that Alsbrook was under ongoing surveillance for drug-related activities is without merit. The record reflects that Detective Falcone never testified that Alsbrook was under surveillance for any sort of criminal activity; rather, he stated that he was familiar with Alsbrook from frequently working in Alsbrook's neighborhood. N.T., 10/11/17, at 62-63, 65. We agree with the trial court's conclusion that the testimony's probative value significantly outweighed any alleged prejudicial effect. Accordingly, we discern no abuse of discretion.

Alsbrook next argues that the trial court erred when it allowed the Commonwealth's expert witness to testify regarding gunshot residue tests that he conducted without first disclosing the contents to Alsbrook during pre-trial discovery, in violation of the discovery rules and **Brady**.[3] Alsbrook's Br. at 21-22. Prior to trial, the Commonwealth's gunshot residue expert submitted a two-page expert report to the Commonwealth, and the Commonwealth then turned it over to Alsbrook. However, on the day the expert was expected to testify, which was a Thursday, the Commonwealth produced the expert's notes, which appear to have contained the raw data upon which the expert based his opinion. **See** N.T., 10/12/17, at 65-66.[4] Defense counsel objected that his strategy would have been different and he would have obtained an

---

[3] **Brady v. Maryland**, 373 U.S. 83 (1963).

[4] **See also** N.T., 10/16/17, at 11.

expert if he had known about the notes. He asked the court to delay the expert's testimony until the following week, so that counsel could review the materials, and to grant him leave to move to preclude the expert's testimony following that review. *Id.* at 73-74. The court granted the requests. *See id.* at 77.

On the following Monday, before the expert testified, the prosecutor put on the record an agreement between counsel to "cure" the "issue" of the prosecution providing the notes to the defense on the preceding Thursday. N.T., 10/16/17, at 9. The parties agreed that the prosecutor could call the expert to the stand, but the expert could not refer to his notes during his direct testimony and the prosecutor would not ask any questions on direct about the notes. *Id.* The prosecutor also agreed to instruct the expert not to mention the notes during his testimony. *Id.* However, the parties further agreed that if defense counsel asked questions on cross that required the expert to refer to the notes, he would then be able to refer to them. *Id.* Defense counsel stated he would not ask any questions requiring the expert to do so. *Id.* at 10. Notably, he did not at any time dispute the prosecutor's statement that the parties had entered into the agreement in order to "cure" any alleged violation. Nor did he ever say that he had had insufficient time to review the notes or obtain an expert, or that Alsbrook sustained prejudice in any way.

Alsbrook now argues that the Commonwealth had access to these additional documents, or at least could have obtained them, and failed to provide them to Alsbrook until after the trial had commenced, despite

Alsbrook's requests in discovery. Alsbrook's Br. at 17, 24. According to Alsbrook, not having these materials prejudiced him, as he was unable to obtain an expert on such short notice and present any alternate theory, including cross-contamination, since two detectives testified during trial that they handled Alsbrook's clothing without wearing protective gloves. *Id.* at 17, 24-25.

The Commonwealth counters that it did not receive the expert's additional materials until after the trial had commenced and it immediately provided them to Alsbrook as soon as it received them. Commonwealth's Br. at 12-13. The Commonwealth further argues that the trial court granted defense counsel additional time over the weekend to review the additional documents. *Id.* at 13. Moreover, the Commonwealth contends that the issue was cured by the parties' agreement not to mention the notes unless defense counsel opened the door on cross-examination of the expert witness. *Id.*

Pennsylvania Rule of Criminal Procedure 573(B)(1)(a) requires the Commonwealth to disclose to the defense "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth." Pa.R.Crim.P. 573(B)(1)(a). "The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware." *Commonwealth v. Collins*, 957 A.2d 237, 253 (Pa. 2008).

*Brady* held that a due process violation occurs when the prosecution willfully or inadvertently withholds evidence favorable to a defendant.

*Commonwealth v. Dennis*, 17 A.3d 297, 308 (Pa. 2011). In order to prove a *Brady* violation, "a defendant is required to demonstrate: (1) evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." *Id*. Prejudice occurs in the *Brady* context if "the evidence suppressed [is] material to guilt or punishment." *Commonwealth v. Gibson*, 951 A.2d 1110, 1126 (Pa. 2008).

We do not find any reversible error. Even assuming the materials were in the Commonwealth's possession and control,[5] Alsbrook has not shown that they were exculpatory, and moreover, he entered into an agreement with the prosecution to "cure" the alleged violation. He never once objected that he ultimately had had insufficient time to prepare, and we do not see how he could have done so, given his agreement. Further, as the trial court pointed out, the allegedly late provision of the notes did not prevent him from obtaining an expert. Alsbrook could have sought to obtain his own expert once he obtained the expert's two-page report in discovery, well in advance of trial. Accordingly, we conclude that the trial court did not abuse its discretion.

Lastly, Alsbrook contends the trial court erred when it denied his motion to suppress his alleged statements made to Detective Antonini after he was

---

[5] *See Commonwealth v. Collins*, 957 A.2d 237, 253 (Pa. 2008) (explaining that materials exclusively in the possession of the police are deemed to be in the Commonwealth's possession for purposes of *Brady* but not Rule 573).

arrested. Our standard of review of a denial of a motion to suppress evidence is well settled:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous.

**Commonwealth v. Jones**, 121 A.3d 524, 526 (Pa.Super. 2015) (citation and brackets omitted). Further, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." **Commonwealth v. Gallagher**, 896 A.2d 583, 585 (Pa.Super. 2006) (citation omitted).

At the suppression hearing, Detective Antonini testified that on December 19, 2013, he arrested Alsbrook on an outstanding armed robbery warrant. N.T., 1/12/17, at 53-54. Detective Antonini stated that he read Alsbrook his **Miranda**[6] rights and informed him of his right to remain silent, his right to an attorney, and the fact that anything he said could be used against him. **Id.** at 53, 55. Detective Antonini testified that Alsbrook did not

---

[6] **Miranda v. Arizona**, 384 U.S. 436 (1966).

wish to provide a written statement. *Id.* at 55-56. He further stated that after he read Alsbrook his *Miranda* rights, Alsbrook spontaneously stated that "it was self-defense" but he "did not want to go on paper." *Id.* at 56-57, 62. Detective Antonini said that Alsbrook did not make these statements in response to any question that he asked him. *Id.* at 56-57, 62-63. The detective also testified that another detective, Detective Fife, was present when he gave Alsbrook his *Miranda* rights. *Id.* at 60-62.

Alsbrook argues that there is no evidence that Alsbrook understood his *Miranda* warnings since they were not recorded by audio or video and Alsbrook did not sign a *Miranda* waiver card. Alsbrook's Br. at 26. Alsbrook further asserts that Detective Antonini's testimony about his alleged statements was completely self-serving and was not credible because, by Detective Antonini claiming that Alsbrook said that "it was self-defense," it appeared that Alsbrook implicitly admitted that he was on the scene of the crime and involved in the shooting. *Id.* 26-27. As such, Alsbrook argues that the court should have suppressed the statements. *Id.* at 27.

The Commonwealth responds that there is no requirement that a specific format must be used to effectuate the valid waiver of a suspect's *Miranda* rights. Commonwealth's Br. at 17. The Commonwealth further contends that Detective Antonini did not elicit Alsbrook's statements; thus, suppression was unwarranted. *Id.* at 16-17.

Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of *Miranda* rights.

*Commonwealth v. Williams*, 941 A.2d 14, 30 (Pa.Super. 2008) (*en banc*). However, "[v]olunteered or spontaneous utterances by an individual are admissible even without **Miranda** warnings." **Id.** Indeed, unsolicited remarks, not the result of custodial interrogation, are "spontaneous, voluntary statements not subject to suppression." **Commonwealth v. Fisher**, 769 A.2d 1116, 1125 (Pa. 2001); **see also Commonwealth v. Johnson**, 42 A.3d 1017, 1029 (Pa. 2012) (stating that "**Miranda** does not preclude the admission of spontaneous utterances").

Detective Antonini testified that Alsbrook spontaneously volunteered these statements of his own free will, and not in response to any police conduct or questioning. The suppression court was free to determine the credibility of Detective Antonini and presumably found him to be credible. **Gallagher**, 896 A.2d at 585. Indeed, Alsbrook fails to identify any police conduct that elicited these statements. Thus, the remarks constitute mere voluntary utterances and were properly admissible. Accordingly, the court properly did not suppress Alsbrook's statements to Detective Antonini.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/05/2020