J-A11004-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA     :     IN THE SUPERIOR COURT OF
                                 :              PENNSYLVANIA
                                 :
            v.                   :
                                 :
                                 :
WALIEK SHAKUR VEREEN             :
                                 :
            Appellant            :     No. 1252 MDA 2024

Appeal from the Judgment of Sentence Entered July 10, 2024
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0002062-2023

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:          **FILED: MAY 27, 2025**

Waliek Shakur Vereen (Appellant) appeals from the judgment of

sentence entered following his jury convictions of one count each of

aggravated assault, aggravated assault with a deadly weapon, simple assault

and recklessly endangering another person (REAP); and his conviction by the

trial court of harassment.[1]  After careful review, we affirm.

The trial court described the facts underlying this appeal, as developed

at trial:

> Appellant's ex-girlfriend, Serena Pernice [(Ms. Pernice)], testified
> on behalf of the Commonwealth regarding her relationship with
> Appellant and the events that gave rise to the underlying charges.
> (N.T., 4/15/2024, pp. 25-48).  Ms. Pernice stated that on the night
> of July 6, 2023, she went to 1316 Prospect Avenue in Scranton,

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(1) & (4), 2701(a)(1), 2705, 2709.

Pennsylvania[,] to see her boyfriend at the time, … Appellant. ***Id.*** at 26. She was awoken at 6:00 a.m. by Appellant's ex-girlfriend, Jennifer,[2] which resulted in a verbal altercation involving law enforcement intervention. ***Id.*** at 28. Jennifer was told to leave the premises, but returned later in the day to collect some of her belongings from [] Appellant. ***Id.*** at 29.

During the time Appellant left his residence to bring Jennifer her items, Appellant's neighbor and victim, Shamar Person[3] (Mr. Person or the victim), knocked on the door and asked Ms. Pernice for a cigarette, which she provided to him. ***Id.*** When Appellant returned with Jennifer, he accused Ms. Pernice and the victim of having sexual intercourse while he was gone. ***Id.*** at 30. Appellant was then observed by Ms. Pernice putting a multi-colored pocketknife in his waistband. ***Id.*** at 31. Despite Ms. Pernice denying the claims made by Appellant, Appellant had told Jennifer to fight Ms. Pernice, and the two women became involved in a physical altercation with one another. ***Id.***

Trial Court Opinion, 11/18/24, at 2-3 (punctuation modified, footnotes added).

As described by the trial court, Mr. Person testified at trial regarding the events of July 6, 2023:

Mr. Person was awoken at 6:30 a.m. by arguing from Appellant and his girlfriend. [N.T., 4/15/24,] at 70-71. He ha[d] heard Appellant's voice prior to that day and was able to identify that it was Appellant who was arguing with another woman. ***Id.*** at 71. [Mr. Person] said it was easy to hear things from other rooms due to the walls being so light. ***Id.*** Mr. Person saw Appellant outside arguing and was aware of the fact that the police escorted [Appellant's] girlfriend away. ***Id.*** [Mr. Person] eventually came downstairs to cook in the kitchen, and afterwards went outside to ask Appellant for a cigarette. ***Id.*** at 72. [] Appellant instructed Mr. Person to ask the woman in his room, identified as [Ms.]

---

[2] Jennifer did not testify at trial, and her last name is not provided in the certified record.

[3] Mr. Person and Appellant rented rooms at the same residence.

Pernice, for a cigarette, which Mr. Person ended up doing before returning to the kitchen. *Id.* at 72-73. Mr. Person saw Appellant and his girlfriend walking into the residence before hearing more arguing and fighting coming from Appellant's room. *Id.* at 74.

Eventually, Appellant call[ed] Mr. Person upstairs. *Id.* Mr. Person went up the stairs and knocked on Appellant's door[,] when Appellant opened the door and stabbed Mr. Person. *Id.* Mr. Person testified that no one else besides himself and Appellant were near the door. *Id.* at 75. Mr. Person testified that he believed he was stabbed with a pocketknife, and the doctors at the hospital had informed him that he was indeed stabbed with a knife. *Id.* After being stabbed, Mr. Person jumped down the stairs, exited the apartment, and walked a block or two down the street. *Id.* at 75-76. Mr. Person testified that he was instructed by individuals outside to lay down on the ground before [until police officers arrived at the scene]. *Id.* at 76.

Trial Court Opinion, 11/18/24, at 5-6 (punctuation modified).

Regarding the injuries sustained by Mr. Person during the attack,

[Dr. David Deisher] (Dr. Deisher)] testified that [Mr. Person] arrived at the hospital and was considered a Level I trauma showing signs of hemorrhagic shock. [N.T., 4/15/24,] at 54. Level I was indicated as the most serious level of trauma, where there is an active threat to life or limb. *Id.* The problem list for the victim's intake … included "ileus, post-operatively, status post exploratory laparotomy and exploratory surgery, hemothorax on the right side, pneumomediastinum, a stab wound of the abdomen intraperitoneal, acute respiratory failure, liver laceration and open wound into the cavity, portal vein injury, arm laceration of the left, and … a stab wound of the scapula, right." *Id.* at 56.

Dr. Deisher testified that [Mr. Person's] first stab wound to the abdomen "was as serious as they can get … [a]nytime you have an injury to the liver like [the victim] did you have a high chance of bleeding to death." *Id.* at 56. Injuries to the liver can involve complications such as a bile leak, which only have a 50% chance of healing, or involve the liver dying off completely. *Id.* At one point during the initial operation, the surgeons were worried about the increased risk of death due to the stress on the victim's body and placed him on a ventilator. *Id.* at 58. The victim's laceration

- 3 -

to the arm was deep enough to hit bone and cut through muscle, while the stab wound to the back went through muscle. ***Id.*** at 59. With the combination of injuries that the victim sustained, there was a 70-80% chance that he could have succumbed to his injuries. ***Id.***

Since the incident on July 6, 2023, the victim has had to undergo two (2) surgeries. ***Id.*** Dr. Deisher testified that in his expert medical opinion, the victim would have died if he was not operated on. ***Id.*** at 62. The victim's injuries forced him to remain at Geisinger [Community Medical Center] from July 6, 2023, until July 12, 2023, requiring blood transfusions during his stay after his surgeries were conducted. ***Id.*** The stab wounds the victim suffered were, in Dr. Deisher's opinion, caused by some sort of knife. ***Id.*** Dr. Deisher's opinion[] that "based on [the victim's] injur[ies] to the liver, specifically those to the liver and portal vein or IVC area, if those went untreated[, he] could say with almost 100 percent certainty [the victim] would have bled [out], and … even despite surgery, sometimes 70 to 80 percent of the people will go on to die within the next 30 days just from the complications that arise." ***Id.*** at 63-64.

Trial Court Opinion, 11/18/24, at 3-4.

Scranton Police Detective Edward McIntyre (Detective McIntyre) investigated the stabbing of Mr. Person. N.T., 4/16/24, at 4-7. As described by the trial court,

[Appellant's] address [at] 1316 Prospect Avenue was searched, but the knife used for the stabbing was not located or discovered during the investigation. [N.T., 4/16/24,] at 13. Because Appellant fled from the scene on July 6, 2023, Detective McIntyre did not locate Appellant until a later date. ***Id.*** Appellant was found in New York City on August 15, 2023, before he was transported back to Scranton by Detective McIntyre and his partner on September 6, 2023. ***Id.*** at 13-14.

Trial Court Opinion, 11/18/24, at 7.

Following a trial, at which Appellant testified, the trial court convicted Appellant of harassment and the jury convicted Appellant of all other charges.

J-A11004-25

On July 10, 2024, the trial court sentenced Appellant to an aggregate prison term of 102-204 months. Appellant timely filed post-sentence motions, which the trial court denied. Thereafter, Appellant filed the instant timely appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. Whether the trial court abused its discretion in allowing the Commonwealth to show the jury [body camera (body cam) video] footage of the victim bleeding on the street during direct testimony and then again during the Commonwealth's closing argument[,] when the probative value on the issue it was admitted for was outweighed by its unfair prejudice that it caused?

2. Whether the trial court abused its discretion when it denied Appellant's request for a mistrial after the testimonial reference to Appellant's post-arrest silence during trial, [] violated both the United States Constitution and the Pennsylvania Constitution, since the error was not harmless and [was] the Appellant prejudiced to the point of being denied a fair trial?

3. Whether the trial court abused its discretion when it failed and refused to give the standard instruction suggested by Appellant but instead gave an incomplete and/or inaccurate jury instruction regarding justification[,] which caused prejudice since it negatively impacted the way the jury could consider the defense?

Appellant's Brief at 3.

Appellant first argues that the trial court improperly permitted the jury to view the body cam video of the victim bleeding on the ground. *Id.* at 11. According to Appellant, the Commonwealth sought to introduce the video to show the nature of the wounds suffered by Mr. Person. *Id.* at 14. Appellant directs our attention to the trial court's acknowledgment that the video was

- 5 -

unpleasant and showed Mr. Person covered in blood. *Id.* However, Appellant points out the trial court's acknowledgment that the video "did not specifically focus in or zoom in on the stab wounds[,] which some of you may find inflammatory." *Id.* (quoting N.T., 4/15/24, at 78). Appellant argues, "If [the video] did not show the wounds, it had essentially no evidentiary value to admit it for that purpose. The lack of evidentiary value clearly did not outweigh the likelihood of inflaming the passions of the jury." *Id.*

Appellant insists "there [was] more reasonable and less inflammatory alternative evidence[,] that was not prejudicial[,] which established the nature of the wounds much better than the body cam video." *Id.* at 15. Appellant points out that Mr. Person, while testifying, was asked to lift his shirt to show his scars to the jury. *Id.* Appellant insists that

> showing the scars and [Dr. Deisher's] testimony regarding the "nature and severity" of the wounds were better and more appropriate alternatives to showing the bloody victim lying on the street on the body cam video.

*Id.* at 15-16. Moreover, Appellant argues, he admitted to stabbing the victim. *Id.* at 16. Thus, Appellant maintains the trial court abused its discretion in allowing the body cam video to be shown to the jury as evidence of the "nature of the wounds." *Id.* at 17.

"We review a challenge to the trial court's evidentiary rulings for an abuse of discretion." *Commonwealth v. Williamson*, 330 A.3d 407, 414 (Pa. Super. 2025) (citation omitted). "[T]he appellant sustains the 'heavy burden' to show that the trial court has abused its discretion."

- 6 -

***Commonwealth v. Christine***, 125 A.3d 394, 398 (Pa. 2015) (citation omitted). Consequently, our standard of review is narrow:

> The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. Where the evidentiary question involves a discretionary ruling, our scope of review is plenary.

***Williamson***, 330 A.3d at 414 (citation omitted).

"The threshold inquiry with admission of evidence is whether the evidence is relevant." ***Commonwealth v. Yale***, 249 A.3d 1001, 1022 (Pa. 2021) (citation omitted). "Evidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Pa.R.E. 401(a); ***see also Commonwealth v. Minerd***, 753 A.2d 225, 230 (Pa. 2000) (recognizing that relevant evidence "logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact." (citation and quotation marks omitted)).

"Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice." ***Commonwealth v. Fransen***, 42 A.3d 1100, 1106 (Pa. Super. 2012); ***see also*** Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice."). Evidence will not be excluded merely because it is harmful to the defendant. ***Commonwealth v. Kouma***, 53 A.3d 760, 770

(Pa. Super. 2012). "[E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case." *Id.* However, the court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand. *Id.*

In determining the admissibility of allegedly prejudicial evidence under Rule 403, the court applies a two-step analysis: (1) the court must determine whether the evidence is indeed inflammatory, and, (2) if the evidence is inflammatory, the court must determine whether "it is of such evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Wallace*, 244 A.3d 1261, 1269-70 (Pa. Super. 2021). Video evidence is inflammatory if it is unnecessarily gruesome. *See Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa. Super. 2011) (*en banc*) ("This Court has interpreted inflammatory to mean the photo is so gruesome it would tend to cloud the jury's objective assessment of the guilt or innocence of the defendant."); *see also Commonwealth v. Wright*, 961 A.2d 119, 139 (Pa. 2008) (determining that photographs of homicide scene were not inflammatory because evidence only showed "limited" amounts of dried blood and were not "unnecessarily gruesome"); *Commonwealth v. Malloy*, 856 A.2d 767, 777 (Pa. 2004) (determining that photographs of murder victim's gunshot wounds to his head were not inflammatory where they were not "unnecessarily gruesome");.

In a case involving the admissibility of photographic evidence, our Supreme Court has recognized that, "even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs." ***Commonwealth v. Rush***, 646 A.2d 557, 560 (Pa. 1994). Similarly, in ***Commonwealth v. Johnson***, 42 A.3d 1017 (Pa. 2012), our Supreme Court held that eighteen inflammatory photographs of the murder victim's injuries were admissible due to their essential evidentiary value. ***Id.*** at 1034. The Supreme Court reasoned that the photos supplemented limited testimony, were necessary to show the nature of the injuries the victim sustained, and were only shown to the jury during the trial and not during deliberations. ***See id.*** at 1034-35.

Instantly, the Commonwealth charged Appellant with aggravated assault and aggravated assault with a deadly weapon.

A person is guilty of aggravated assault if he:

**(1)** attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

\* \* \*

**(4)** attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S.A. § 2702(a)(1), (4).

The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent

disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 2301. To obtain a conviction for aggravated assault,

> when the victim sustained serious bodily injury, the Commonwealth must establish that the offender acted intentionally, knowingly, or with a high degree of recklessness that included an element of deliberation or conscious disregard of danger. At a minimum, the Commonwealth must prove that the offender acted with malice, consciously disregarding an unjustified and extremely high risk that his actions might cause death or serious bodily harm. In other words, a defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result.

*Commonwealth v. Faulk*, 928 A.2d 1061, 1070 (Pa. Super. 2007).

This Court has recognized that "guns, knives, and other clearly offensive weapons constitute the most obvious and commonly encountered forms of deadly weapons." *Commonwealth v. Williamson*, 330 A.3d 407, 420 (Pa. Super. 2025) (quoting *Commonwealth v. Raybuck*, 915 A.2d 125, 128 (Pa. Super. 2006) (citations omitted). Further, the Pennsylvania Code provides that a deadly weapon can be defined as

> [a]ny dangerous weapon (as defined in 18 Pa.C.S.[A.] § 913), or … [a]ny device, implement, or instrumentality designed as a weapon or capable of producing death or serious bodily injury where the court determines that the offender intended to use the weapon to threaten or injure another person.

204 Pa. Code § 303.10.

Regarding REAP, Section 2705 of the Crimes Code provides that "[a] person commits a misdemeanor of the second degree if he recklessly engages

- 10 -

in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705.

A person commits the crime of simple assault if he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another." *Id.* § 2701(a)(1). The term "bodily injury" is defined as "impairment of physical condition or substantial pain." *Id.* § 2301.

The trial court addressed and rejected Appellant's challenge to the admissibility of the body cam video because (a) the court's cautionary instruction cured any potential prejudice; and (b) the evidence was relevant for the jury to determine whether the victim suffered serious bodily injury:

> It has been stated that "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." *Commonwealth v. Hairston*, 84 A.3d 657, 666 ([Pa.] 2014). We presume that jurors, when given a cautionary instruction, have followed the instruction." *Id.*[;] *Commonwealth v. Roney*, … 79 A.3d 595, 640 ([Pa.] 2013)[;] … *Harrington*, … 262 A.3d [at] 645 …. Prior to the Commonwealth playing the body cam[] footage the first time during direct examination, [the trial court] gave specific instructions to the jury regarding the nature of the video:
>
>> What I'm going to do is caution you with regards to the video that's going to be played. It does depict Mr. Person covered in blood. It doesn't specifically focus in or zoom in on the stab wounds which some of you may find to be inflammatory. It's going to be treated as any other piece of evidence. You're not to be prejudiced by this in any which way, shape, or form[.]
>
> N.T., 4/15/2024, pp. 77-78. This same instruction was not repeated at the time the Commonwealth played the video for a second time during[its] closing argument[,] despite [Appellant's] counsel objecting. N.T., 4/16/2024, [at] 67. However, [the trial court] reiterated to the jury during jury instructions that "you

- 11 -

should not let it stir up your emotions to the prejudice of [Appellant]. Your verdict must be based on a rational, fair consideration of all of the evidence, not on passion or prejudice against [Appellant] by looking at the video." *Id.* at 86.

Appellant argues that the instruction was not sufficient to erase any unfair prejudice [that] playing the video in court may have caused. However, there is no reason for [the court] to believe the jury did not listen to the instructions [the court] provided to them on two separate occasions. **The video depicted the extent of the victim's injuries he sustained at the hands of Appellant.**

….

**Having the video played in open court allowed the jury to see for themselves the injuries which the victim sustained at the hands of Appellant and make the determination as to whether they believed the injuries constituted serious bodily injury**[,] using the appropriate law the [c]ourt instructed them to use. Any potential prejudice was arguably rectified by the multiple instructions given to the jury before the video was played the first time and at the conclusion of the trial itself. The victim testified that the body cam[] footage was a fair and accurate description of his encounter with the Scranton Police on July 6 of 2023[,] and was not changed or altered in any way. N.T., 4/15/2024, [at] 76-77. **The Commonwealth introduced the body cam**[] **footage, and this** [c]**ourt allowed the introduction of this evidence, for the purpose of showing the nature of the wounds suffered by the victim.** *Id.* at 79.

Trial Court Opinion, 11/18/24, at 15-17 (punctuation modified; emphasis added).

Upon reviewing the evidence and the trial court's reasoning, we cannot conclude the trial court's admission of the body cam video demonstrated "manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." *Williamson*, 330 A.3d at 414. The trial court applied the proper legal test, and held that the video was necessary

for the jury to fully grasp the severity of the wounds inflicted on Mr. Person. Where, as here, Appellant was charged with two counts of aggravated assault and one count of simple assault, and the victim had sustained several wounds, the evidence was relevant to determine whether Appellant sustained bodily injury or serious bodily injury as to each count. Discerning no abuse of discretion, we conclude Appellant's challenge to the admissibility of the body cam video merits no relief. ***See id.***

In his second issue, Appellant argues that the trial court improperly denied his motion for a mistrial, after a Commonwealth witness testified regarding Appellant's post-arrest silence. Appellant's Brief at 17. Appellant argues that the prosecutor asked Detective McIntyre whether he had interviewed Appellant following his apprehension in New York. ***Id.*** at 21 (citing N.T., 5/16/24, at 14). Detective McIntyre responded, "I attempted to but [Appellant] denied my request for interview." ***Id.*** (quoting N.T., 4/16/24, at 14). Although Appellant's counsel immediately motioned for a mistrial, the trial court denied the motion. ***Id.*** Appellant acknowledges that the trial court issued a cautionary instruction, but argues "the damage was already done since, as our Supreme Court has held, jurors view a person's exercise of his right to remain silent as an admission of guilt." ***Id.***

Appellant further argues the error was not harmless. ***Id.*** Appellant points out his own testimony that he had stabbed Mr. Person in self-defense. ***Id.*** Therefore, Appellant asserts, his credibility was at issue. ***Id.*** at 21-22.

Appellant compares this case to the circumstances deemed reversible error in

***Commonwealth v. Costa***, 742 A.2d 1076 (Pa. 1999), and ***Commonwealth***

***v. Rivera***, 296 A.3d 1141 (Pa. 2023). Appellant's Brief at 22. Appellant

argues the evidence of his guilt was not overwhelming. ***Id.*** at 22. According

to Appellant,

> [t]he only other person in the room or eyewitness who testified[, Ms. Pernice,] stated she was in the midst of a fight with another person when [] Appellant opened the door to [Mr. Person] and she didn't see what happened between Appellant and the victim. N.T., 4/15/24, 32[.] There were no other witnesses to the incident.

***Id.*** at 22-23.

> When responding to a motion for mistrial,
>
> the trial court is to "determine whether misconduct or prejudicial error actually occurred, and if so, to assess the degree of any resulting prejudice." ***Commonwealth v. Sanchez***, … 907 A.2d 477, 491 (Pa. 2006). "When a party moves for a mistrial, such relief is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." ***Commonwealth v. Feliciano***, 884 A.2d 901, 903 (Pa. Super. 2005) (internal quotation and citation omitted). "A trial court is vested with the sound discretion to determine whether a mistrial is warranted, and we review its decision for an abuse of that discretion." ***Id.*** (citation omitted).

***Commonwealth v. Baker***, 313 A.3d 1112, 1119-20 (Pa. Super. 2024).

> An abuse of discretion is more than an error of judgment. On appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised by the trial court was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

***Id.*** at 1120 (citation omitted).

> An accused in a criminal proceeding

has a legitimate expectation that no penalty will attach to the lawful exercise of his constitutional right to remain silent. [**Commonwealth v.**] **Turner**, … 454 A.2d [537, 540 [(Pa. 1982)]. Consequently, [the Supreme Court] held in **Turner** that a defendant cannot be impeached by use of the inconsistency between his silence at the time of his arrest and his testimony at trial….

Following **Turner**, [our Supreme Court] has been consistent in prohibiting the post-arrest silence of an accused to be used to his detriment….

**Commonwealth v. Mitchell**, 839 A.2d 202, 212-13 (Pa. 2003) (most citations omitted; emphasis added).

As the Pennsylvania Supreme Court has explained, the United States Supreme Court has recognized three types of trial errors, termed "structural errors," whereby the harmless error doctrine could preclude the grant of a new trial:

The first [is] a violation of a constitutional right that is "not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as, for example, the right of an individual to conduct his or her own defense, inasmuch as impairment of that right contravenes the legal principle undergirding the constitutional guarantee — namely, that a defendant has the fundamental right to make choices regarding the protection of his or her own liberty. **Weaver**, [**v. Massachusetts**, 582 U.S. 286,] 137 S. Ct. 1899,] 1908 [2017)]; **accord McCoy** [**v. Louisiana**, 584 U.S. 414], 138 S. Ct. [1500,] 1511 [(2018)].

The second category concern[s] those situations where "the effects of the error are simply too hard to measure," for instance, where a defendant is denied the right to proceed with counsel of his or her choosing. **Weaver** 137 S. Ct. at 1908. The Court reasoned that, in such situations, "the precise effect of the violation cannot be ascertained," and "[b]ecause the government will, as a result, find it almost impossible to show that the error was harmless beyond a reasonable doubt, the efficiency costs of

- 15 -

letting the government try to make the showing are unjustified." *Id.* (citation and internal quotation marks omitted); *accord McCoy*, 138 S. Ct. at 1511.

> **Finally, the Court specified that an error would be "deemed structural if the error always results in fundamental unfairness.** For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. It therefore would be futile for the government to try to show harmlessness." *Weaver* 137 S. Ct. at 1908 (citations omitted). Notably, the Court further underscored that **"[t]hese categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural.**" *Id.*

*Commonwealth v. Taylor*, 309 A.3d 754, 777-78 (Pa. 2024) (emphases added). Thus,

> harmless error exists [if] … (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Hairston*, 84 A.3d at 671-72 (citation omitted); *accord Rivera*, 926 A.3d at 1146-47.

Appellant relies on our Supreme Court's decisions in *Costa* and *Rivera* in arguing that the prosecutor's error required reversal. In *Costa*, the appellant was convicted of nineteen counts of various sex offenses related to his molestation of three boys. *Costa*, 742 A.2d at 1076. The sole issue was whether the appellant's trial counsel rendered ineffective assistance by failing to object to the admission of police testimony regarding the defendant's post-

arrest silence. *Id.* The Supreme Court, agreeing that the reference constituted error, addressed the question of an appropriate remedy:

> Given an improper reference to the accused's silence, a determination must be made as to whether the error was harmless. If it is clear that it could not have contributed to the verdict, the error may be deemed harmless. Here, we cannot say that the error could not have contributed to the verdict.

*Id.* at 1077-78. The Supreme Court concluded a new trial was required, given the prejudice resulting from the error:

> At trial, three boys testified that on various occasions they were sexually abused by appellant. Appellant testified in his own defense and denied that he committed any acts of molestation. In the face of these accusations and denials, there was no overwhelming evidence of guilt. Hence, credibility was pivotal to the outcome of trial. **The reference to appellant's post-arrest silence would not only have raised an adverse inference of guilt but would also have undermined his credibility insofar as his denial, at trial, of the allegations against him, particularly with regard to the abuse of Terry Foster** [(**one of the accusers**].). The testimony in question plainly served to impeach appellant's denial of the charges and his explanation of facts relating to his interactions with the three boys, these being matters that appellant addressed for the first time at trial. Jurors were given the opportunity to have concluded that if appellant were not guilty, he would not have waited until trial to assert his innocence. It cannot be said as a matter of law that this improperly elicited testimony could not have affected the verdict[;] thus, due to trial counsel's failure to object, appellant is entitled to a new trial.

*Id.* at 1078 (emphasis added).

In **Rivera**, Jonathan Rivera (Rivera) was accused of the sexual abuse of two minors. **Rivera**, 296 A.3d at 1142. The trial focused on the credibility of the complaining witnesses, as there was a lack of physical evidence supporting

- 17 -

the charges. *Id.* at 1143. During trial, the prosecutor asked questions relating to Rivera's post-arrest silence **on four occasions**:

> [T]he four questions the prosecutor asked here related to Rivera's post-arrest, post-*Miranda*[4] silence. The inquiry was not a one-off, unfocused, slip-of-the-tongue affair; the prosecutor hammered the point four times in four ways.[FN1]
>
> ---
>
> [FN1] (*See* N.T., 8/7/2019, at 101 ("[1] After you read him his *Miranda* [w]arnings, he never told you that he didn't do anything to any of these kids? … [2] He never denied doing anything to— … [3] He never said[,] I didn't do this? … [4] What did he say?").)
>
> ---
>
> If there was any doubt that these questions focused on the post-arrest period, the prosecutor removed such doubt at the outset of re-direct.[FN2]
>
> ---
>
> [FN2] (*See* N.T., 8/7/2019, at 101 ("And was [Rivera] arrested based on the arrest warrant?").)

*Id.* at 1149 (bracketed footnotes in original; one footnote added).

Our Supreme Court granted allowance of appeal to determine

> [w]hether prejudice is presumed from the improper use at trial of post-arrest, post-*Miranda* silence, requiring the Commonwealth to show beyond a reasonable doubt that the error did not affect the verdict—or whether, as the Superior Court held, the standard that governs the use of pre-arrest silence, from which prejudice is not presumed, also governs constitutional harmless error from the improper use of post-arrest, post-*Miranda* silence[.]

---

4 *Miranda v. Arizona*, 384 U.S. 436 (1966).

*Commonwealth v. Rivera*, 273 A.3d 510 (Pa. 2022) (*per curiam*). In resolving this issue, the Supreme Court opined that,

> [a]ll said, testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution. **Here, the four questions-and-answers about Rivera's post-arrest, post-*Miranda* silence violated this fundamental rule**; as we have said before, they reduced his right to remain silent to a "hollow mockery," [*Commonwealth v.*] *Haideman*, 296 A.2d [765], 767[ (Pa. 1972)], "implie[d] an admission of guilt," [*Commonwealth v.*] *Greco*, 350 A.2d [826], 828[ (Pa. 1976)], and created an illusion that he "was in fact guilty." [*Commonwealth v.*] *Singletary*, 387 A.2d [656], 657 [(Pa. 1978)]. By telling the jury that he "stood mute or claimed his privilege" after his arrest, the Commonwealth ultimately caught him in that disallowed Catch-22—"[y]ou have the constitutional right to remain silent, but if you exercise it, that fact may be used against you." *Miranda*, 384 U.S. at 468 n.37; *Haideman*, 296 A.2d at 768 (citation omitted). In short, these references penalized Rivera for exercising his right to remain silent and were, therefore, a "constitutionally impermissible" infringement on that right. [*Commonwealth v.*] *Turner*, 454 A.2d [537], 540 [(Pa. 1982)]; *Haideman*, 296 A.2d at 766.

*Rivera*, 296 A.3d at 1157 (emphasis added).

Nevertheless, our Supreme Court stopped short of declaring a testimonial reference to post-arrest silence the type of structural error requiring reversal. *See id.* at 1160. Instead, our Supreme Court applied the harmless error test provided in *Hairston*, concluding, in that sexual assault case, that the admission of evidence that harmed Rivera's credibility was not harmless error. *Id.* at 1161. The Supreme Court ultimately concluded it could not "say beyond a reasonable doubt that 'the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial

effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.'" ***Id.*** at 1160 (quoting ***Hairston***, 84 A.3d at 671-72 (citation omitted)). In concluding that the error was *not harmless*, the Supreme Court cited, in part, the lack of sufficient curative instructions. ***Id.*** at 1160.

Instantly, our review discloses that at trial, Detective McIntyre testified regarding his retrieval of Appellant from outside of the Commonwealth:

Q. [The Commonwealth:] At some point was [Appellant] located?

A. [Detective McIntyre:] [Appellant] was located in New York City.

Q. … How was he transported back to Scranton?

A. Myself and my partner drove out to New York City, picked [Appellant] up at the federal building in New York City and transported him back.

….

Q. [The Commonwealth:] Do you see the man in the courtroom today that you transported back from New York City?

A. Yes, in the white shirt sitting at the defense table.

[The Commonwealth]: Judge, let the record reflect the witness identified [Appellant].

THE COURT: Let the record reflect that.

Q. [The Commonwealth:] Did you interview [Appellant]?

A. [Officer McIntyre:] I attempted to, but he denied my request for interview.

N.T., 4/16/24, at 13-14. At this time, defense moved for a mistrial based on the Commonwealth's violation of Appellant's Fifth Amendment right to remain silent. *Id.* at 15. The trial court denied the motion for mistrial, but issued the following cautionary instruction:

> As I instructed you several times during the course of this trial,[5] [Appellant] has an absolute right to remain silent[,] [a] constitutional right to remain silent.

N.T., 4/16/24, at 15 (footnote added). The Commonwealth ended its direct examination of Officer McIntyre after the court's cautionary instruction. *Id.* At the close of evidence, the trial court issued the following instruction to the jury:

> A fundamental principle of our criminal justice system is that a defendant is presumed innocent. The mere fact that he was arrested and charged with crimes is not evidence of guilt. A defendant is presumed to remain innocent throughout the trial unless and until you decide based upon a careful and impartial consideration of the evidence that the Commonwealth has proven him guilty beyond a reasonable doubt of the charges made against him. It is not the defendant's burden to prove he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crimes charged and that

---

[5] At the beginning of trial, the trial court issued the following instruction to the jury:

> At the close of the Commonwealth's case[,] the defense may present evidence, but as I told you before, the defendant has no obligation to offer evidence or to testify. Under the law every defendant is presumed to be innocent and has the right to remain silent. The burden is on the Commonwealth to prove the defendant guilty beyond a reasonable doubt.

N.T., 4/15/24, at 4.

the defendant is guilty of those crimes beyond a reasonable doubt. A person accused of a crime is not required to present evidence or to prove anything in his own defense.

N.T., 4/16/24, at 70. At the conclusion of the trial court's instructions, neither the Commonwealth nor defense counsel requested additional instructions.

In its opinion, the trial court rejected Appellant's claim of prejudicial error warranting the grant of a mistrial:

> The reference to Appellant's silence was elicited during witness questioning regarding whether [Appellant] conducted an interview with Detective McIntyre; the Commonwealth did not go into specifics regarding what that interview may have looked like, simply inquiring into whether Appellant made any sort of statement to law enforcement. An appropriate cautionary instruction was given to the jury immediately following the line of questioning, and the Commonwealth ended [its] questioning of the witness immediately after the cautionary instruction was given to the jury. The [prosecutor] did not exploit Appellant's silence and rested [its] case after [Detective McIntyre] left the stand. Taking these facts into consideration, it is of [the court's] belief that the cautionary instruction ameliorated the reference to Appellant's silence post-arrest[, which does] not warrant a mistrial.

Trial Court Opinion, 11/18/24, at 23. The trial court further deemed the error harmless, in light of the overwhelming evidence of Appellant's guilt. *Id.* We agree.

Here, unlike in **Costa**, the improper testimony did not directly contradict any evidence from any witness. Unlike the circumstances in **Rivera**, the prosecutor here made only a single reference to Appellant's post-arrest silence and, in context, the error was *de minimus*. Further,

> the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

insignificant by comparison that the error could not have contributed to the verdict.

*Hairston*, 84 A.3d at 671-72 (citation omitted). Consequently, we discern no error or abuse of the trial court's discretion in denying Appellant's motion for a mistrial. Appellant's second issue merits no relief.

In his third issue, Appellant argues that the trial court improperly rejected his requested jury instruction on self-defense/justification. Appellant's Brief at 23. According to Appellant, he requested that the trial court issue the Pennsylvania Standard Criminal Jury Instruction related to justification. *Id.* at 25. In particular, Appellant requested that the trial court include the following language:

> Keep this in mind: a person is justified in using force against another not only when they are in actual danger of unlawful attack but also when they mistakenly, but reasonably, believe that they are.

*Id.* (quoting N.T., 4/16/24, at 42). In support, Appellant cites *Commonwealth v. La*, 640 A.2d 1336 (Pa. Super. 1994), wherein this Court upheld the standard jury instruction on justification

> adequately conveyed to the jury that [a]ppellant and his co-defendants were entitled to use deadly force against [the victims] if they reasonably or mistakenly believed that they were in immediate danger of death or serious bodily harm at the hands of these men.

Appellant's Brief at 26 (quoting *La*, 640 A.2d at 1346).

Appellant claims that, rather than issuing the standard jury instruction on justification, the trial court issued an instruction that failed to instruct the

jury that Appellant "could mistakenly but reasonably believe he was in actual danger of unlawful attack." *Id.* at 27. According to Appellant, the trial court's instruction "limited the jury to consider whether Appellant actually believed he was in danger[,] which is contrary to the standard jury instructions and inconsistent with what this Court has held was a proper instruction." *Id.* at 27-28.

As this Court has explained,

[i]t is axiomatic that, in reviewing a challenged jury instruction, an appellate court must consider the entire charge as [a] whole, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue. An instruction will be upheld if it clearly, adequately and accurately reflects the law. **The trial court may use its own form of expression to explain difficult legal concepts to the jury, as long as the trial court's instruction accurately conveys the law**.

*Commonwealth v. Kane*, 188 A.3d 1217, 1231 (Pa. Super. 2018) (emphasis in original) (quoting *Commonwealth v. Barnett*, 121 A.3d 534, 545 (Pa. Super. 2015)). "There is error in jury instructions only when the trial court abuses its discretion and inaccurately states the law." *Id.*

Crimes Code Section 505 provides that

[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S.A. § 505(a). Section 505 also provides that

an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious

- 24 -

bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

**(i)** The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle ….

**(ii)** The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

*Id.* § 505(b)(2.1)(i)-(ii).  As this Court stated in *La*, "[u]se of deadly force in defense of self or another cannot be justified unless the actor or actors reasonably believe that such force is necessary to avoid death or serious bodily harm." *Id.*

At trial, the court issued the following instruction on justification:

If the Commonwealth proves to [the jury] beyond a reasonable doubt that [Appellant] used deadly force, then to prove that such force was not justifiable in this case[,] it must prove beyond a reasonable doubt that [Appellant] did not reasonably believe that he was in immediate danger of death or serious bodily injury from [Mr.] Person at the time he used the force and that, therefore, his belief that it was necessary for him to use deadly force to protect himself was unreasonable.  Put another way, the Commonwealth must prove either that [Appellant] did not actually believe he was in danger of death or serious bodily injury such that he needed to use deadly force to defend himself in that moment, or that [Appellant] actually believed he needed to use such force [and] his belief was unreasonable in light of all the circumstances known to him.

N.T., 4/16/24, at 85.

In its opinion, the trial court considered and rejected Appellant's claim of error in its justification instruction:

The instruction Appellant wanted read aloud included the following language: "[K]eep this in mind, the person is justified in using

deadly force against another not only when they are in actual danger of unlawful attack but also when they mistakenly, but reasonably, believe that they are." The [trial c]ourt found this portion of the instruction confusing and did not read it to the jury. Furthermore, the [trial c]ourt believed that [the] instructions which were read to the jury clearly encompassed this idea in a manner less complicated for the jury to understand and apply.

It has been stated by the Pennsylvania Superior Court that "the court owes a duty to the jury not to confuse it with instructions which are neither relevant nor related to the issues." [**Commonwealth**] **v. Kwatkoski**, … 406 A.2d 1102, 1106 ([Pa. Super.] 1979). Here, the jury was properly instructed on self-defense without redundant, confusing language. (N.T., 4/16/2024, pp. 83). It was noted during jury instructions that self-defense is called justification in the law of Pennsylvania, and if the jury believed the actions of Appellant were justified, they could not find him guilty beyond a reasonable doubt. **Id.** To properly charge a jury, "a trial judge must communicate to the jury that when evidence of an affirmative defense is offered, the Commonwealth still has the burden to prove each element of the crime charged beyond a reasonable doubt," [**Commonwealth**] **v. Hamilton**, … 766 A.2d 874, 881 ([Pa. Super.] 2001). [The trial c]ourt properly reminded the jury that it is the Commonwealth's burden to prove that the Appellant did not act in justifiable self-defense. (N.T., 4/16/2024, pp. 83-84).

Trial Court Opinion, 11/18/24, at 20. The trial court opined that the charge it

issued,

as a whole, is enough to guide the jury that Appellant's actions could have been deemed justified if [the jury] believed he was warranted in defending himself. The additional jury instruction [requested] by Appellant does not add any information the jury was not already instructed on.

**Id.** at 21.

Upon careful review, we agree with the trial court's analysis and

conclusion. The charge, when read as a whole, adequately conveyed to the

- 26 -

jury that the use of deadly force for self-defense "cannot be justified unless the actor or actors reasonably believe that such force is necessary to avoid death or serious bodily harm." *La*, 640 A.2d at 1346. Appellant's third issue merits no relief. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/27/2025